[Cite as *State v. Moore*, 2021-Ohio-1379.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                    :

    Plaintiff-Appellee,                   :

                                         No. 19AP-464

v.                                                    :        (C.P.C. No. 18CR-1246)

Jordan D. Moore, Sr.,                         :        (REGULAR CALENDAR)

    Defendant-Appellant.                 :

---

D E C I S I O N

Rendered on April 20, 2021

---

**On brief:** [*G. Gary Tyack*], Prosecuting Attorney, and *Kimberly M. Bond*, for appellee.

**On brief:** *Adam J. Banks*, for appellant.

---

APPEAL from the Franklin County Court of Common Pleas

KLATT, J.

{¶ 1} Defendant-appellant, Jordan D. Moore, Sr. ("appellant"), appeals a judgment of the Franklin County Court of Common Pleas convicting him, pursuant to jury verdict, of two counts of felonious assault. Finding no merit to the appeal, we affirm.

{¶ 2} By indictment filed March 14, 2018, plaintiff-appellee, State of Ohio, charged appellant with two counts of felonious assault in violation of R.C. 2903.11, felonies of the second degree. Appellant pleaded not guilty and requested a jury trial. Appellant was tried jointly with co-defendant James D. Fife ("Fife").[1]

---

[1] Fife was also charged with two counts of felonious assault in violation of R.C. 2903.11, felonies of the second degree. At trial, appellant and Fife were represented by separate counsel.

{¶ 3}    The state presented the following evidence in its case-in-chief.

{¶ 4}    Chatos Obey ("Chatos") testified that on December 31, 2017, he and his then-fiancé (now wife), Erin Palmer ("Erin"), his sister, Ashley Green ("Ashley"), his mother, Merrie Obey ("Merrie"), and Merrie's partner, Michelle White ("Michelle"),[2] celebrated New Year's Eve at Rosie O'Grady's, a restaurant/bar located on Morse Road in Columbus. The group was there for several hours, eating, drinking, and playing pool. Just after midnight on January 1, 2018, the family walked outside to the patio area to smoke. Chatos saw Fife, and the two made eye contact. According to Chatos, Fife said "what the F you looking at?" (Tr. at 405.) Chatos told Ashley that he met Fife while the two were in jail together,[3] and that Fife did not like him.

{¶ 5}    Chatos and his family decided to leave the bar. Because there was no exit from the patio to the parking lot, they had to walk back inside the bar in order to leave through the front entrance. Chatos led his group through the walkway from the patio to the bar. Once inside, Chatos was immediately "picked up * * * 10 feet off the ground [and] slammed onto the ground" by the bouncer. *Id.* at 411. He was then "just getting wailed on. I couldn't see. It was just blows * * * hitting me left and right." *Id.* Chatos identified his assailants as "James Fife, his group, Jordan Moore, the [bouncer]." *Id.* at 412. He testified that he "caught glimpses" of his assailants as he was "getting tossed around." *Id.* The assailants kicked him and hit him with their fists. Chatos and Erin were then pushed out the front door into the parking lot. Because the rest of the family was still inside the bar, Chatos and Erin remained in the parking lot. Chatos spoke to the bouncer, who apologized about what had happened. Immediately thereafter, Fife, appellant, and a large, light-skinned African American man with braids, later identified as Daquan Shropshire ("Shropshire"),[4] "jumped" Chatos in the parking lot and beat him unconscious. *Id.* at 413.

---

[2] Where appropriate, we collectively refer to Chatos, Erin, Ashley, Merrie, and Michelle as "the Obey family."

[3] Jacob Stanley, a Corrections Officer with the Franklin County Sheriff's Office, confirmed that Chatos and Fife were housed together in the Franklin County Jail for three days in April 2016 (State's Ex. 46(a) and 46(b)).

[4] Shropshire passed away prior to trial.

By the time he regained consciousness, all three assailants had left the scene. Chatos and Erin sat inside their vehicle and waited for his family members to emerge from the bar.

{¶ 6} Police soon arrived at the scene. Chatos had difficulty answering their questions because his jaw was broken and he was in tremendous pain. He observed Merrie being placed in an ambulance. Chatos sat in the ambulance with Merrie for a while but refused medical treatment for himself. He eventually drove Erin home and then asked his brother to drive him to the hospital. Hospital personnel confirmed his jaw was broken; he had surgery the next morning to repair it, which involved wiring his jaw closed.

{¶ 7} Chatos identified State's Ex. 28, a DVD containing security footage of Rosie O'Grady's during the relevant time period.[5] The surveillance video was played during trial. According to Chatos, it depicts the security guard picking him up and slamming him to the floor as he re-entered the bar from the patio. While he was on the ground, he was punched and kicked by four individuals, including appellant and Shropshire. The security footage then shows Chatos and Erin being pushed out the front door into the parking lot. He identified appellant, Fife, and Shropshire walking out the front door into the parking lot. Appellant and Fife then knocked him to the ground; when he tried to sit up, appellant kicked him.

{¶ 8} Chatos further testified that Ashley later found photographs of appellant, Fife, and Shropshire on Facebook and showed them to him; he identified them as the individuals who assaulted him. On January 4, 2018, he was interviewed by two Columbus Police detectives. During that interview, Chatos was shown three photo arrays; he identified appellant, Shropshire, and Fife as the three men who assaulted him at Rosie O'Grady's. At trial, he expressly averred that his photo array identifications of appellant and Fife were not based upon viewing their photographs on Facebook; rather, he identified them because they were the individuals who assaulted him. He further testified that he was "100 percent" certain of his identifications. *Id.* at 469, 479.

{¶ 9} Chatos identified photographs taken by the detectives which depict the injuries he sustained in the fight, including his wired broken jaw. (State's Ex. 7-11.) Chatos testified that he believed his jaw was broken during the fight inside the bar; however, he

---

[5] The parties stipulated that the security footage was "clarified" for purposes of trial presentation by Jeff Brenner at the Bureau of Criminal Investigation. (Tr. at 429.)

further averred "outside I think really helped it get broke." (Tr. at 477.) He denied that he provoked the fight or did anything to cause the bouncer to throw him to the floor. He provided in-court identification of appellant as one of the individuals who assaulted him both inside and outside the bar. *Id.* at 472.

{¶ 10} Erin, Merrie, Michelle, and Ashley also testified about the incident. Much of their testimony corroborated that provided by Chatos and each other, with some exceptions, additions, and differences. According to Erin, while she and her family were outside on the patio, Fife walked outside with some other men. Chatos told her that he knew Fife from jail and "had a problem with him." *Id.* at 588. After Fife and Chatos said "what's up" to each other, Erin feared that "something's about to happen." *Id.* at 587-88. Because she did not want her family to be involved in a fight, she pushed Chatos toward the door leading into the bar. Once inside, the bouncer threw Chatos into the air. She "didn't see anything" after Chatos was thrown into the air because she had dropped her engagement ring and was searching for it on the floor. *Id.* at 589. After locating her ring, she saw the bouncer push Chatos out the door into the parking lot. Erin followed Chatos and chastised the bouncer for his actions. The bouncer apologized to her and Chatos.

{¶ 11} Shortly thereafter, Fife, appellant, and Shropshire walked into the parking lot. Erin identified the three men on the security footage. (State's Ex. 28.) Appellant and Fife pushed her to the ground and started "beating [Chatos] crazy." (Tr. at 592.) The men were "beating on him on the ground, kicking him, stomping him in his face, and he's just laying there." *Id.* Erin walked inside the bar and saw Merrie with her face covered in blood. She then walked back to the parking lot and saw Fife. She encouraged Chatos to fight Fife "one-on-one," which he did. *Id.* at 594. Moments later, appellant joined Fife in fighting Chatos. Erin walked to her vehicle and retrieved her gun from under the passenger seat. She ultimately decided not to use the gun and placed it back under the seat. She walked back into the bar and asked Merrie what had happened to her. At that point, the police arrived; Erin told them what had happened to Chatos and took them to him. Erin encouraged Chatos to report what had happened, but he told her he could not talk or move. He refused transport to the hospital. Chatos and Erin then drove home. Erin passed out because she was drunk; Chatos' brother drove him to the hospital.

{¶ 12} The next day, she and Ashley visited Chatos in the hospital. In an effort to identify his assailants, Chatos averred that he thought the first name of the man with whom he had been in jail began with a "J." *Id.* at 604. They eventually found Fife's Facebook page, which included several photographs of him and appellant.

{¶ 13} From photo arrays presented by the police on January 4, 2018, Erin identified appellant, Shropshire, and Fife as the three men who assaulted Chatos at Rosie O'Grady's. At trial, she expressly stated that her photo array identifications were not based upon viewing their photographs on Facebook; rather, she identified them because they had assaulted Chatos. *Id.* at 627-28. She provided in-court identifications of appellant and Fife as Chatos' assailants.

{¶ 14} On cross-examination, Erin averred that Shropshire hit Chatos prior to the bouncer slamming him to the floor. She surmised that the bouncer did so because he believed Chatos was the "problem." *Id.* at 650.

{¶ 15} Merrie testified that she saw Fife while they were outside on the patio and noticed that he had several tattoos. He approached her and asked why she was looking at him. He then walked inside the bar. To avoid any potential problems, the family decided to leave. Because there was no exit from the patio, they had to walk through the bar area to exit through the front door. Once inside, three men, later identified as Fife, appellant, and Shropshire, started "coming at" Chatos. *Id.* at 690. The bouncer and other bar patrons blocked the family's exit. The bouncer picked up Chatos and threw him onto the floor. Fife, appellant, and Shropshire then "swarmed from behind" and "started beating [Chatos] to death." *Id.* at 693. In an effort to help Chatos, Merrie hit one of the men with a wine glass. In retaliation, Shropshire choked Merrie and pinned her against the wall. Appellant joined Shropshire and the two men "proceeded to beat me and stomp me in the face and my head," rendering her unconscious. *Id.* at 696. When she regained consciousness, she was in tremendous pain; indeed, she felt like she "was going to die." *Id.* at 697. She was transported to the hospital by ambulance and diagnosed with a "brain bleed." *Id.* at 699. As a result of her injuries, she has suffered cognitive disabilities and memory loss.

{¶ 16} On January 4, 2018, detectives interviewed her and took photographs of her injuries. (State's Ex. 1-6.) From photo arrays, she identified Fife as one of the individuals who blocked the family's exit. She knew Fife's name because Ashley had sent her

photographs of him she had discovered on Facebook. At trial, she specifically stated that her photo array identification of Fife was not based upon seeing his photograph on Facebook; rather, she remembered him from the bar. She candidly admitted that she could not identify either appellant or Shropshire from the photo arrays. However, at trial, she positively identified appellant as the man who assaulted Chatos and then her.

{¶ 17} On cross-examination, Merrie blamed her failure to identify appellant from the photo array on her medical condition. However, she acknowledged that she did not indicate on the form accompanying the photo array that her medical condition precluded her from identifying appellant. She further acknowledged that she was presented the photo arrays closer in time to the incident, yet she could not identify appellant at that time.

{¶ 18} Michelle testified while she and her group were outside on the patio, Fife asked them why they were looking at him. As they walked inside the bar, the men, later identified as Fife, appellant, and Shropshire, surrounded them. The men grabbed Chatos by the throat and threw him into a crowd of people; they then "started wailing on [Chatos] badly." (Tr. at 739.) Chatos eventually got up and went outside with Erin. Meanwhile, Michelle saw Merrie on the floor; her face was bleeding badly and she was unconscious. She did not see how Merrie had been injured.

{¶ 19} When presented with photo arrays on January 4, 2018, Michelle identified Fife as "[t]he one that was like what are you looking at and started pushing" and appellant as the person who "was on" Merrie. (*Id.* at 749-50; State's Ex. 35a, 35b, 36a, 36b.) At trial, Michelle testified that she was "100 percent" sure of her identifications. (Tr. at 750.) She also provided in-court identifications of Fife and appellant as Chatos' assailants.

{¶ 20} Ashley testified that prior to the fight, Erin told her that Chatos was a "little upset" and might want to leave because he had seen Fife, whom he met in jail. *Id.* at at 792. While on the patio, Chatos made eye contact with Fife, who said "What's your problem? Why are you looking at me?" *Id.* at 796. Fife told Chatos that he knew him from jail and asked him if he wanted to fight. At that point, Ashley and her group decided to leave and walked into the bar. Fife followed them and then walked over to talk to his friends, later identified as appellant and Shropshire. Ashley and Merrie asked them to leave them alone. Immediately thereafter, Ashley saw the bouncer throw Chatos onto the floor. Fife, appellant, Shropshire, the bouncer, and "random other people from the bar" began

punching and kicking Chatos. *Id.* at 800-01. Merrie attempted to pull the men off Chatos. To create a distraction, Ashley grabbed a bottle from the bar and threw it to the floor. Shropshire then accused Merrie of hitting him over the head with a bottle; he picked Merrie up by the neck, slammed her to the floor, and kicked her in the face several times. Appellant joined Shropshire and kicked Merrie in the side of the head several times. By this time, Merrie was unconscious. Fife stood nearby, cheering on appellant and Shropshire. After the assault, the men left the bar through the front entrance. After the police arrived, Ashley recounted what had happened to Chatos and Merrie.

{¶ 21} Following the incident, Ashley searched social media sites to find the men who assaulted them. Ashley found several Facebook profiles attributed to Fife, one of which was under the name "James Jwhiite." *Id.* at 819-20, 826. She subsequently found Fife's list of Facebook friends, one of whom was appellant. She scrolled through appellant's photographs and found several he had posted of him, Fife and Shropshire together at Rosie O'Grady's. Ashley recognized the men in the photographs as those who had assaulted Chatos and Merrie.

{¶ 22} Ashley also found a montage of three photographs appellant posted on January 1, 2018 at 8:21 p.m. The montage, captioned "My current situation," included a close-up photograph of appellant, a photograph of appellant wearing a walking boot on his right foot, and a close-up photograph of a plate of food. (State's Ex. 17.) According to Ashley, Fife, through his "James Jwhiite" profile, commented on appellant's post, stating "You mean to tell me his face harder than your foot," followed by two smiley faces and one strong arm emojis. (Tr. at 826, State's Ex. 18.) Immediately following that comment, appellant replied, "Him and his momma." (State's Ex. 18.) Ashley took a screenshot of the posts and sent them to Merrie.

{¶ 23} Ashley was interviewed by detectives on January 11, 2018. From photo arrays, she identified Shropshire as the person "who attacked [Merrie], kicking her on the ground and holding her neck against the wall." (Tr. at 844-45, State's Ex. 38a, 38b). She identified appellant as the person who "assisted [Shropshire] in kicking [Merrie]" and "first to jump [Chatos]." (Tr. at 845; State's Ex. 39a, 39b.) Finally, she identified Fife as "leader of the pack, started fight, jumped [Chatos]." (Tr. at 846; State's Ex. 40a, 40b.) At trial, Ashley reiterated her identifications of appellant and Fife.

{¶ 24} On cross-examination, Ashley acknowledged that by the time she was interviewed on January 11, 2018, she had already completed her Facebook investigation and had sent her family screenshots of photographs and posts from appellant's Facebook page. She further conceded that the Facebook photographs of appellant at Rosie O'Grady's depict him wearing a dark-colored shirt, while the security footage does not depict any of Chatos' attackers wearing a dark-colored shirt.

{¶ 25} Dr. Victor Nguyen, the emergency room physician who treated Merrie at the hospital, testified that Merrie sustained multiple facial fractures as well as a subarachnoid hemorrhage, commonly known as a "brain bleed." (Tr. at 367.) Dr. Nguyen opined that Merrie's injuries would have caused serious physical pain and that her subsequent memory loss and cognitive and speech difficulties were consistent with having suffered a traumatic brain injury.

{¶ 26} Dr. Monte E. Masonbrink, the oral and maxillofacial surgeon who treated Chatos at the hospital, testified that Chatos suffered a bilateral jaw break which required surgery to wire his jaw closed. Dr. Masonbrink opined that Chatos' injuries would have been very painful, resulting in immediate speech difficulties. He further opined that Chatos' injuries were consistent with having been struck multiple times on both sides of his face or having been slammed to the ground. Dr. Masonbrink also testified that Chatos' toxicology screen revealed a blood-alcohol concentration of .142.

{¶ 27} Columbus Police Officers Adam Dague and Brandon Fleming testified as first responders at Rosie O'Grady's on January 1, 2018. Fleming described Merrie as a "concussed" woman with bloody facial injuries, who reported that two African American men, one "really heavyset," and one with a medium build, assaulted her. *Id.* at 905, 910. Medics arrived at the scene and transported Merrie to the hospital; Chatos, who had sustained injuries to his jaw, was "uncooperative" and refused to go to the hospital. *Id.* at at 909. Body cameras worn by Dague and Fleming captured both visual images and audio from the scene, which were copied onto a DVD and played during trial. (State's Ex. 45.)

{¶ 28} On cross-examination, Dague acknowledged that State's Ex. 45 depicts Erin stating that Chatos fought with only one man and that Chatos said he would "deal with it himself." (Tr. at 901.) Fleming acknowledged that State's Ex. 45 depicts Merrie describing the man with the medium build as bald and wearing a white shirt. He further acknowledged

that State's Ex. 45 depicts the bouncer telling Ashley that Chatos had "start[ed] trouble." *Id.* at 920.

{¶ 29} Detective Anthony Richardson testified that he interviewed appellant at the Franklin County Jail on March 9, 2018. The audio portion of the interview was copied to a CD and played at trial. (State's Ex. 24.)[6] During that interview, appellant stated that he had turned himself into the police after becoming aware that Shropshire had already done so. He admitted that he was at Rosie O'Grady's with Shropshire and Fife and that Fife was involved in an altercation which ultimately involved bar security as well as several patrons. He acknowledged that he was involved in the fight inside the bar and punched several people; however, he did so only in self-defense. He stated that an unknown person hit him in the back of the head and the face with a glass bottle, which ultimately required him to have surgery to remove glass from his eye. He also stated that outside the bar, "somebody with dreads * * * was * * * trying to fight with me, but he was coming at me and I still was trying to protect myself." (Tr. at 945; State's Ex. 24.) He further averred that his face was bloody, that he had "multiple people jumping on me," and that he was "in defense mode." (Tr. at 950; State's Ex. 24.)

{¶ 30} Richardson informed appellant that security footage from the bar showed him, Fife, and Shropshire fighting with a man outside the bar and that "one of you, looked like you, did the old Charlie Brown football kick right in his face when he was laying on the ground. Looked like he was trying to get up, boom, and then he was down and didn't move." (Tr. at 949; State's Ex. 24.) Appellant averred that he did not remember kicking the man.

{¶ 31} Appellant acknowledged during the interview that he sprained his right ankle when he fell during the fight and that he was wearing a "boot" as a result. (Tr. at 953; State's Ex. 24.) He also conceded that he posted pictures of his ankle injury on Facebook. When asked about the comment he posted about "Him and his momma," he said "I'm not going to lie to you, I was super drunk. But after the fact, everybody told me what was going on. And I'm not going to put no names on it, but I know * * * what happened with the mom * * *. I guess she was fighting too. This is what the security guard was telling me. She was fighting

---

[6] Over the state's objection, the trial court did not allow the jury to listen to the interview during deliberations. However, the interview was transcribed and made part of the appellate record.

too."  (Tr. at 955; State's Ex. 24.)  Appellant denied that he kicked the woman; indeed, he stated that he did not even know she was in the bar.

{¶ 32}  Richardson interviewed Fife on March 29, 2018.  The audio portion of the interview was copied to a CD and played at trial. (State's Ex. 44.)[7]  During the interview, Fife averred that he and his wife saw appellant and Shropshire at the bar, but they were not "with them."  (Tr. at 979; State's Ex. 44.)  He acknowledged that there was a bar fight during which he was hit in the head with a bottle.  As he and his wife were trying to leave, a man "chased me, grabbed me, threw me to the ground" in the parking lot.  (Tr. at 982; State's Ex. 44.)  He thought the man's wife had a gun.  Richardson told Fife that security footage from the bar showed him and others beating and kicking Chatos. Fife did not recall being jailed with Chatos or fighting with him at the bar.  He also did not remember appellant's foot being hurt during the fight or posting a comment about it on Facebook.

{¶ 33}  On cross-examination, Richardson acknowledged that the Columbus Police Department employs social media forensic analysts; however, he did not know whether an analyst had examined appellant's Facebook account.  He admitted that the Facebook comment he questioned Fife about was actually posted by a person identified as "James Jwhiite" (Tr. at 998; State's Ex. 18), and that the photographs appellant posted on Facebook on January 1, 2018 at 8:21 p.m. (State's Ex. 13), show Fife's Facebook profile as "James Fife."  (Tr. at 998.)

{¶ 34}  Richardson further acknowledged that the security footage from the bar depicts a person alleged to be appellant wearing a light-colored shirt, while State's Ex. 13 depicts appellant wearing a dark-colored shirt.  In addition, he acknowledged that State's Ex. 13 demonstrates that appellant had close-cropped hair but was not bald.

{¶ 35}  Detective Ronald Lemmon testified that Erin called him on January 3, 2018 to inquire about a police report that had been filed about the incident; the report listed appellant, Fife, and Shropshire as suspects.  From this information, Lemmon generated photo arrays of the suspects, which were shown to the Obey family on January 4, 2018.

{¶ 36}  Lemmon further testified that on January 6, 2018, he and Richardson interviewed George Buzhowski, the owner of Rosie O'Grady's, and the bouncer, Quentin

---

[7] Over the state's objection, the trial court did not allow the jury to listen to the interview during deliberations.  However, the interview was transcribed and made part of the appellate record.

Edwards. The detectives obtained security footage and submitted it to the Bureau of Criminal Investigation for enhancement. Lemmon viewed the security footage and acknowledged that the clothing colors in the security video appear to be different than those in the still photographs found on appellant's Facebook page. However, he testified that in his more than two-decade experience as a police officer, he had viewed footage from thousands of security videos and had observed the same phenomenon regarding color differences in clothing.

{¶ 37} Lemmon also testified that Merrie sent him screenshots taken from appellant's Facebook page depicting appellant, Shropshire, and Fife at Rosie O'Grady's. Lemmon then independently accessed appellant's Facebook page and printed those and other posted photographs; he also independently accessed the comments posted on appellant's Facebook page, including the post referencing his injured ankle. Lemmon testified that he was "satisfied" that the Facebook page he accessed was that of appellant. (Tr. at 1055.) Lemmon acknowledged that the Columbus Police Department employs social media forensic analysts. However, he did not engage them in the investigation because appellant had admitted in his March 9, 2018 interview that he had posted the photographs on his Facebook page and did not deny that his Facebook friends commented on them.

{¶ 38} Following the state's presentation of its case, appellant and Fife separately moved for judgment of acquittal pursuant to Crim.R. 29(A). The trial court denied both motions. Thereafter, appellant presented the following evidence on his behalf.

{¶ 39} Edwards testified that approximately 250 people were in the bar on January 1, 2018. At some point, appellant was struck in the face with a bottle. Appellant sustained a cut over his eye, and Buzhowski told Edwards to accompany appellant to the kitchen so he could tend to his injury.

{¶ 40} On cross-examination, Edwards testified that he was interviewed by a detective on January 5, 2018. In that interview, Edwards stated that the person who struck appellant with a bottle was a light-skinned African American man who was later injured in a fight. He acknowledged that he did not tell the detective that he took appellant to the kitchen during the fight. After viewing the security footage, Edwards conceded that the dark clothing he was wearing appeared to look white in the video. He denied that he threw

Chatos to the floor inside the bar or later apologized to him outside. He also testified that he did not witness Chatos being beaten up in the parking lot.

{¶ 41} Appellant testified that he met Shropshire and Fife at Rosie O'Grady's. At some point, Chatos approached the group and said "This ain't got shit to do with you all. I want [the] white boy."[8] Shropshire responded "[h]e's with me" and then punched Chatos. (Tr. at 1257.) Thereafter, several fights broke out, during which Chatos was thrown into the air. Appellant was not involved in any of the fights; indeed, he did not punch, kick, or hurt anyone. However, he was struck in the head with a bottle and in the face with a glass object which resulted in an injury to his eye. At some point, he fell down and twisted his ankle. Edwards then walked appellant, Shropshire, and Fife to the walkway between the bar and the patio. A man he did not know wearing "dreads" and a little wrap over his head "square[d] up" with him in the walkway. *Id.* at 1242. Edwards then took appellant to the kitchen and provided first aid for his eye injury; thereafter, appellant left the bar and went home. He went to the hospital later that morning to obtain treatment for his ankle injury.

{¶ 42} Later that evening, he posted pictures of food and his injured ankle on Facebook, which generated comments from some of his Facebook friends. According to appellant, the comment he posted about "Him and his momma" was in response to comments posted by Shropshire that had been deleted. *Id.* at 1245. Although he could not remember Shropshire's precise comments, he recalled that it was "something to the effect that they got beat up," to which appellant replied "Him and his momma." *Id.* at 1246. He further averred that "I didn't know. * * * [P]eople was calling me and telling me what was going on, but I didn't know. *Id.* Appellant denied assaulting either Chatos or Merrie; indeed, he denied even seeing Merrie in the bar.

{¶ 43} On cross-examination, appellant was questioned about medical records generated from his hospital visit stating that "[t]he mechanism of injury was kicking someone during an altercation last night." (Tr. at 1304; State's Ex. 51.)[9] Appellant denied telling hospital personnel that he kicked someone; rather, he said only that he was in a bar fight. Noting the March 9, 2018 interview during which he told Richardson that he sustained an eye injury requiring surgery to remove glass from his eye, the prosecutor

---

[8] Fife is Caucasian.

[9] State's Ex. 51 was identified at trial but was not admitted into evidence.

questioned appellant about medical records indicating that he had suffered no injuries to his head. Appellant explained that he went to a different hospital to have his eye treated; however, he acknowledged that he did not have medical records to substantiate his claim.

{¶ 44} Regarding the Facebook posts and comments, appellant acknowledged that "James Jwhiite" is one of his Facebook friends. He did not know the context of the comment "You mean to tell me his face harder than your foot." He reiterated his direct examination testimony that the "Him and his momma" comment was not made in reply to that comment; rather, it was made to deleted comments made by Shropshire. He also testified that Shropshire hit Merrie; although he did not witness the act, Shropshire later told him about it.

{¶ 45} Kaadijah Travis, Fife's wife, testified on Fife's behalf. She and Fife met their friends appellant and Shropshire at Rosie O'Grady's. Soon after arriving, Chatos started giving Fife "dirty looks" and "rolling his eyes" at him. (Tr. at 1332.) Fife told Kaadijah he had never seen Chatos before. They later saw Chatos on the patio; he again gave them "dirty looks." (Tr. at 1333.) When Kaadijah confronted Chatos about his behavior, he "got mad" and walked toward Fife like he wanted to fight him. *Id.* at 1333. Sensing that things might "go bad," she pulled Fife toward the bar so he would be closer to his friends. *Id.* at 1334.

{¶ 46} Soon thereafter, a fight broke out inside the bar. Kaadijah was injured during the fight and went to the bathroom to clean up. She remained there for several minutes; consequently, she did not see what happened inside the bar. After she returned to the bar, she and Fife walked toward their car. They encountered Chatos and Erin in the parking lot; Erin pointed a gun at them. At Fife's direction, Kaadijah got into their car. She then saw Fife fall to the ground; although she did not see who did so, she deduced that someone hit him.

{¶ 47} The case was submitted to the jury and, following deliberations, the jury returned verdicts finding appellant guilty as charged in the indictment.[10] The trial court subsequently sentenced appellant to four years' incarceration for the felonious assault of Chatos and five years' incarceration for the felonious assault of Merrie. The court ordered the sentences to be served consecutively, resulting in an aggregate prison term of nine

---

[10] The jury also returned verdicts finding Fife guilty as charged in the indictment.

years.  The trial court memorialized the conviction and sentence in a judgment entry filed June 24, 2019.

{¶ 48}  In a timely appeal, appellant sets forth five assignments of error for review:

[I]. The trial court erred in allowing the improper introduction of evidence.

[II]. The defendant's conviction is against the manifest weight and sufficiency of the evidence.

[III]. The defendant's motion for mistrial should have been granted.

[IV]. The defendant was denied effective assistance of counsel such that he is entitled to a new trial.

[V].  The trial court erred in sentencing the defendant.

{¶ 49}  In his first assignment of error, appellant contends the trial court erred in admitting evidence regarding the posts and comments made on appellant's Facebook account in the aftermath of the bar fight.  Specifically, appellant claims that the Facebook evidence was admitted without proper foundation and authentication.  Appellant further claims that he was compelled to waive his Fifth Amendment privilege against self-incrimination in order to dispute this improperly admitted evidence.  Appellant also asserts that the identifications of him provided by the Obey family were tainted by their pre-photo array investigations of appellant's Facebook account.

{¶ 50}  Prior to trial, appellant filed a motion in limine requesting exclusion of "any Facebook post purporting to be [appellant's]."  (Apr. 26, 2019 Mot. in Limine at 1.)  The trial court held a hearing on the motion on April 29, 2019.  Appellant sought exclusion of the photographs and comments made on appellant's Facebook page following the bar fight. Appellant intimated that a fictitious individual may have created the Facebook account and posted the pictures and comments at issue.  Appellant argued that the state had failed to authenticate the Facebook account as belonging to him through testimony either from appellant's Facebook friends who posted comments or from representatives of either Facebook or the Columbus Police internet forensic team.

{¶ 51}  The state argued that it was not required to present such evidence because appellant admitted in his March 9, 2018 interview that he posted the pictures to his

Facebook page and that other people commented on them. Appellant challenged the state's assertions regarding the March 9, 2018 interview. Accordingly, the state played the entire interview for the trial court.[11] As noted in our recitation of facts, appellant admitted in that interview that he posted pictures of his ankle injury on his Facebook page and acknowledged that someone commented "You mean to tell me their head was harder than your foot?" and that he posted the comment "Him and his momma." Indeed, appellant responded "Yes, sir" to the detective's question "Did you post anything * * * on Facebook or any social media about your foot being hurt." He then offered an explanation for his comment. (Apr. 29, 2019 Hearing on Mot. in Limine at 35; State's Ex. 24.) Appellant argued that because the detectives did not provide any context to their question (such as showing him the actual postings), it was possible that the postings were made at some other time and related to some other topic. The state countered that appellant never asserted that he did not understand the detective's question or that he did not post the comment; accordingly, the argument that the postings were made at a different time or related to a different topic went to the weight rather than the admissibility of the evidence.

{¶ 52} Following a brief recess, the trial court orally denied the motion in limine, stating, "I'm going to find there's a prima facie case that [the prosecutor] can use it. It's going to become weight and credibility." *Id.* at 61. Appellant objected to the ruling and, during trial, lodged a continuing objection to admission of the Facebook evidence.

{¶ 53} A motion in limine is a request that the court limit or exclude use of evidence which the movant believes to be improper and is made in advance of the actual presentation of the evidence to the trier of fact, usually prior to trial. *State v. Winston*, 71 Ohio App.3d 154, 158 (2d Dist.1991). Under Ohio law, " '[t]he admission or exclusion of relevant evidence rests within the sound discretion of the trial court.' " *State v. Padgette*, 8th Dist. No. 108525, 2020-Ohio-672, ¶ 7, quoting *State v. Sage*, 31 Ohio St.3d 173, 180 (1987). "Thus, because a trial court's decision on a motion in limine is a ruling to admit or exclude evidence, our standard of review on appeal is whether the trial court committed an abuse of discretion that amounted to prejudicial error." *Sanders v. Fridd*, 10th Dist. No. 12AP-688, 2013-Ohio-4338, ¶ 45. "The term abuse of discretion connotes more than an error of

---

[11] The interview played at the motion hearing was the same interview played at trial. (State's Ex. 24.)

law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 54} "Authentication of evidence is governed by Evid.R. 901(A)." *State v. McCarrel*, 10th Dist. No. 18AP-660, 2019-Ohio-2984, ¶ 35, citing *State v. Howard*, 1st Dist. No. C-170453, 2018-Ohio-3692, ¶ 14.  "The requirement of authentication or identification 'is a condition precedent to admissibility of evidence.' "  *Id.*, quoting *State v. Ollison*, 10th Dist. No. 16AP-95, 2016-Ohio-8269, ¶ 47.  "Pursuant to Evid.R. 901(A), this requirement is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." *Id.*

{¶ 55} "Evid.R. 901(B) sets forth 'a list of illustrations that describe, without limiting, some ways in which evidence may be authenticated as required by Evid.R. 901(A).' "  *Id.* at ¶ 36, quoting *State v Moorer*, 9th Dist. No. 27685, 2016-Ohio-7679, ¶ 8. Those illustrations include: (1) testimony of a witness with knowledge that a matter is what it is claimed to be; and (2) distinctive characteristics of the matter including appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with the circumstances.  *State v. Ross*, 10th Dist. No. 17AP-141, 2018-Ohio-3027, ¶ 36, citing Evid. R. 901(B)(1) and (4), respectively.

{¶ 56} "The threshold for authentication is low: ' "The proponent need not offer conclusive evidence as a foundation [but] must merely offer sufficient evidence to allow the question as to authenticity or genuineness to reach the jury." ' "  *Ollison* at ¶ 47, quoting *State v. Callender*, 10th Dist. No. 15AP-15, 2015-Ohio-4255, ¶ 32, quoting *State v. Caldwell,* 9th Dist. No. 14720 (Dec. 4, 1991).  Further, "Ohio courts have addressed the issue as to the admissibility of evidence from social media content, including Facebook, under the authentication requirements of Evid.R. 901." *McCarrel* at ¶ 39.  "[T]he determination of admissibility and authentication of social media evidence is 'based on whether there was sufficient evidence of authenticity for a reasonable jury to conclude that the evidence was authentic.' " *Padgette* at ¶ 13, quoting *State v. Gibson*, 6th Dist. No. L-13-1222, 2015-Ohio-1679, ¶ 41.

{¶ 57} In the present case, appellant authenticated the Facebook evidence by his own admissions.  Appellant admitted during the March 9, 2018 interview that he posted the photographs on his Facebook page, that his Facebook friends posted comments about

those photographs, and that he posted the comment "Him and his momma" in response to one of those comments. Appellant made an identical admission at trial.

{¶ 58} In addition, Lemmon testified that after Merrie sent him screenshots of appellant's Facebook page, he independently accessed it and observed the photographs and comments at issue. Lemmon testified that he was "satisfied" that the Facebook page he accessed was that of appellant. (Tr. at 1055.)

{¶ 59} Upon review, we find that both appellant and Lemmon authenticated the photographs and comments from appellant's Facebook page. *See* Evid.R. 901(B)(1). In addition to their testimony, the content of the Facebook posts contains information consistent with the events at issue. *See* Evid.R. 901(B)(4). There is no evidence to support appellant's suggestion that his Facebook page was contrived or altered or that the postings at issue related to some other event. Thus, we conclude that the state presented evidence by which a reasonable juror could conclude that the Facebook posts were authentic, and the trial court did not abuse its discretion in denying the motion in limine and admitting the challenged evidence.

{¶ 60} Appellant also contends that he "was forced to waive his right against self-incrimination and testify at trial to dispute the Facebook matters." (Appellant's Brief at 28.) Appellant has not supported this contention by citation to the record or to any legal authority. Further, appellant has not developed this argument beyond the foregoing statement. An appellant bears the burden of affirmatively demonstrating error on appeal. *State v. Sims*, 10th Dist. No. 14AP-1025, 2016-Ohio-4763, ¶ 11. Further, "[a]n appellant must support their assignments of error with an argument, which includes citation to legal authority." *State v. Hubbard*, 10th Dist. No. 11AP-945, 2013-Ohio-2735, ¶ 34, citing App.R. 16(A)(7) and (A)(2); *State v. Smith*, 9th Dist. No. 15AP0001n, 2017-Ohio-359, ¶ 22 (noting that it is not the duty of an appellate court to create an argument on appellant's behalf).

{¶ 61} Finally, appellant contends that the Facebook search conducted by the Obey family tainted their identifications of appellant. Such a claim does not impact the admissibility of their identifications. When the facts do not reveal state action or police misconduct, the alleged suggestiveness of a witness's identification goes to the weight and reliability of the testimony rather than admissibility, a matter addressed through effective cross-examination. *State v. Ware*, 10th Dist. No. 04AP-43, 2004-Ohio-6984, ¶ 55.

Accordingly, appellant's arguments are more properly raised in a manifest weight of the evidence challenge. Indeed, appellant has done so in his second assignment of error, which we address next.

**{¶ 62}** For the foregoing reasons, we conclude that the trial court did not abuse its discretion in denying appellant's motion in limine and admitting the challenged Facebook evidence. Accordingly, appellant's first assignment of error is overruled.

**{¶ 63}** In his second assignment of error, appellant maintains his convictions for felonious assault are not supported by sufficient evidence and are contrary to the manifest weight of the evidence. We disagree.

**{¶ 64}** Sufficiency of the evidence is the legal standard that tests whether the evidence introduced at trial is legally adequate to support a verdict. *State v. Kurtz*, 10th Dist. No. 17AP-382, 2018-Ohio-3942, ¶ 15, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). "Whether the evidence is legally sufficient to support a verdict is a question of law, not fact." *Id.*, citing *Thompkins* at 386. In determining whether the evidence is legally sufficient to support a verdict, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307 (1979).

**{¶ 65}** "In a sufficiency of the evidence inquiry, appellate courts do not assess whether the prosecution's evidence is to be believed but whether, if believed, the evidence supports the conviction." *Kurtz* at ¶ 16, citing *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79-80. "The court essentially assumes the state's witnesses testified truthfully and determines whether that testimony satisfies each element of the crime." *State v. Davis*, 10th Dist. No. 18AP-921, 2019-Ohio-4692, ¶ 38, citing *State v. Bankston*, 10th Dist. No. 08AP-668, 2009-Ohio-754, ¶ 4. Further, "[t]he testimony of even 'one witness, if believed by the jury, is enough to support a conviction.' " *State v. Loomis*, 10th Dist. No. 17AP-843, 2019-Ohio-2576, ¶ 54, quoting *State v. Strong*, 10th Dist. No. 09AP-874, 2011-Ohio-1024, ¶ 42.

**{¶ 66}** In contrast to the sufficiency of the evidence, the weight of the evidence concerns the inclination of the greater amount of credible evidence offered to support one

side of the issue rather than the other. *Thompkins,* 78 Ohio St.3d at 387. Although there may be sufficient evidence to support a judgment, an appellate court may nevertheless conclude that a judgment is against the manifest weight of the evidence. *Id.*

{¶ 67} When presented with a manifest weight challenge, an appellate court engages in a limited weighing of the evidence to determine whether sufficient competent, credible evidence supports the jury's verdict. *State v. Salinas,* 10th Dist. No. 09AP-1201, 2010-Ohio-4738, ¶ 32, citing *Thompkins* at 387. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). However, "in conducting our review, we are guided by the presumption that the jury, or the trial court in a bench trial, 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). Accordingly, this court affords great deference to the jury's determination of witness credibility. *State v. Redman*, 10th Dist. No. 10AP-654, 2011-Ohio-1894, ¶ 26, citing *State v. Jennings*, 10th Dist. No. 09AP-70, 2009-Ohio-6840, ¶ 55.

{¶ 68} An appellate court considering a manifest weight challenge "may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 22, citing *Thompkins* at 387. An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the " 'most exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 69} In the present case, the jury returned verdicts finding appellant guilty of felonious assault as to both Chatos and Merrie. As relevant here, felonious assault is proscribed by R.C. 2903.11(A)(1), which states in part: "No person shall knowingly * * *

[c]ause serious physical harm to another." "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B). "Serious physical harm" is "[a]ny physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain." R.C. 2901.01(A)(5)(e). "Physical harm" means "any injury * * * regardless of its gravity or duration." R.C. 2901.01(A)(3).

{¶ 70} Although appellant contends that the state's evidence was insufficient to support his convictions for felonious assault, he does not raise any arguments related to the state's alleged failure to prove any specific elements set forth in R.C. 2903.11(A)(1). Rather, his arguments essentially challenge the credibility and reliability of the testimony provided by the state's witnesses. However, as noted above, in a sufficiency review, this court does not engage in a determination of witness credibility; rather, we assume the state's witnesses testified truthfully and then determine if that testimony satisfies the elements of the offense. *Davis*, 10th Dist. No. 18AP-921, 2019-Ohio-4692 at ¶ 38. Moreover, this court has determined that although sufficiency and manifest weight are different legal concepts, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding that the conviction is supported by the sufficiency of the evidence. *State v. Braxton*, 10th Dist. No. 04AP-725, 2005-Ohio-2198, ¶ 15, citing *State v. Roberts*, 9th Dist. No. 96CA006462 (Sept. 17, 1997). "[T]hus, a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." *Id.* Accordingly, we examine whether appellant's convictions are supported by the manifest weight of the evidence. *State v. Sowell*, 10th Dist. No. 06AP-443, 2008-Ohio-3285, ¶ 89.

{¶ 71} Appellant argues that his convictions are against the manifest weight of the evidence because the identification testimony provided by the Obey family was neither credible nor reliable. Appellant sets forth several sub-arguments under his credibility/reliability contention. Appellant first asserts that the identifications were "likely a result of his picture on Facebook with the other defendants." (Appellant's Brief at 33.) Appellant's argument is speculative at best and was refuted by testimony provided at trial. Indeed, Chatos and Erin specifically testified that their photo array identifications of

appellant were not based upon viewing his photograph on Facebook; rather, the identifications were based upon their observations of appellant at the time of the incident. The jury was in the best position to evaluate the Facebook investigation evidence and determine whether those investigations tainted the identifications. The trial court instructed the jury that they were to assess the Facebook evidence using the same credibility determinations applied to other evidence. A jury is presumed to follow the trial court's instructions. *State v. Hicks*, 10th Dist. No. 18AP-883, 2020-Ohio-548, ¶ 23. No evidence suggests otherwise.

{¶ 72} Appellant further maintains that Chatos's testimony was incredible and unreliable because he admitted that he could not identify appellant in the security footage as one of the individuals who attacked him inside the bar. Appellant also claims that Chatos did not testify that appellant participated in the attack; rather, he testified only that he recognized appellant. Initially, we note that Chatos was shown the security footage at trial and identified appellant as one of the individuals who kicked and punched him after the bouncer slammed him to the floor. Moreover, even if Chatos could not positively identify appellant in the security footage, such failure did not automatically render his identification of appellant incredible or unreliable. Independent of the security footage, Chatos positively identified appellant at trial as one of his attackers inside the bar. Indeed, as noted above, he identified his assailants as "James Fife, his group, Jordan Moore, the [bouncer]." Further, appellant's arguments regarding Chatos's testimony about what occurred *inside* the bar do not, ipso facto, render his conviction for felonious assault against the manifest weight of the evidence. Chatos unequivocally testified that appellant, along with Fife and Shropshire, "jumped" him in the parking lot and beat him unconscious. In addition, Chatos identified appellant from the photo arrays; indeed, he testified that he was "100 percent" sure of his identification.

{¶ 73} Appellant also argues that Merrie's testimony was incredible and unreliable because she was unable to identify appellant in the photo array presented three days after the incident, yet positively identified him at the trial that was held more than one year after the incident. Defense counsel thoroughly explored this discrepancy during Merrie's cross-examination, challenging her ascription of her failure to identify appellant from the photo array to her medical condition on January 4, 2018. Indeed, this challenge resulted in

Merrie's acknowledgement that she did not indicate on the form accompanying the photo array that her medical condition precluded her from identifying appellant. The jury was in the best position to evaluate this incongruity in Merrie's testimony. "It is generally 'the province of the factfinder to determine the truth from conflicting evidence, whether the conflicting evidence comes from different witnesses or is contained within the same witness's testimony.' " *State v. McGowan*, 10th Dist. No 18AP-467, 2019-Ohio-5319, ¶ 56, quoting *State v. Oteng*, 10th Dist. No. 14AP-466, 2015-Ohio-1231, ¶ 72.

{¶ 74} Appellant also challenges Erin's testimony as incredible and unreliable because she admitted that she "didn't see anything" after the bouncer threw Chatos into the air and referred to those who assaulted Chatos inside the bar as "they" rather than specifically identifying him. (Appellant's Brief at 36.) However, appellant's assertions regarding Erin's testimony about what happened to Chatos inside the bar do not render his conviction for the felonious assault of Chatos against the manifest weight of the evidence. Erin unequivocally testified that appellant and Fife were "beating [Chatos] on the ground, kicking him [and] stomping him in his face" in the parking lot.

{¶ 75} Appellant further asserts that "[e]ven in [Erin's] photo lineup identification, she identifies James Fife as the 'main one he fought' and Dacquan Shropshire as the 'sumo wrestler looking guy' being the one she saw punch Chatos." *Id.* Appellant appears to argue that these specific statements about Fife and Shropshire as his assailants suggest that her identification of him was not as reliable. However, appellant fails to acknowledge that Erin specifically stated in her photo array identification of appellant that he "punched Chatos." (State's Ex. 30a, 30b).

{¶ 76} Appellant challenges Michelle's testimony as incredible and unreliable because she did not specifically identify him as one of Chatos's assailants; rather, "[s]he groups the defendants together as 'they' when she describes that Chatos * * * was snatched up by the throat, thrown into the crowd, and beaten with 'everybody surround[ing] him' * * * despite the undisputed fact that the person who picked him up and threw him into the crowd was one of the security guards/bouncers." (Appellant's Brief at 38.) Appellant also points out that Michelle admitted that she did not see Merrie get assaulted yet identified appellant in the photo array as the person who "was on" Merrie. The jury was able to view Michelle as she testified and assess for itself the veracity of her testimony regarding her

identification of appellant. The jury was free to believe all, part, or none of Michelle's testimony. *State v. Johns*, 10th Dist. 11AP-203, 2011-Ohio-6823, ¶ 17, citing *Hill v. Briggs*, 111 Ohio App.3d 405, 412 (10th Dist.1996).

{¶ 77} Appellant also asserts that Ashley's testimony was incredible and unreliable because she admitted that "a bunch of random other people" joined in the fight inside the bar. (Appellant's Brief at 40). Ashley's assertion that others were involved in the fight does not negate her testimony identifying appellant as one of Chatos's assailants. Further, appellant's challenge to Ashley's testimony regarding appellant's assault of Merrie is without merit. While appellant correctly recounts Ashley's testimony that Shropshire assaulted Merrie, he then asserts that "she adds to her testimony that 'Jordan starts kicking [Merrie] in the head.' " (Appellant's Brief at 41.) Appellant's use of the phrase "she adds to her testimony" implies that Ashley's testimony about appellant assaulting Merrie was merely an afterthought. Appellant's intimation is not supported by the record. To be sure, Ashley testified that Shropshire was the first to assault Merrie; however, she unequivocally testified that appellant joined in the assault and kicked Merrie in the head several times. That Ashley related the sequence of events regarding the assault on Merrie does not establish that she added the testimony about appellant as an afterthought. Nor does it minimize the veracity of her testimony. Further, the argument that Ashley "admit[ted] that Merrie was already unconscious" when appellant kicked her implies that appellant could not commit felonious assault on an unconscious person. (Appellant's Brief at 41.) Because appellant does not support this argument with citation to any legal authority, we decline to address it. *Hubbard,* 10th Dist. No. 11AP-945, 2013-Ohio-2735, ¶ 35; *Smith*, 9th Dist. No. 15AP-0001n, 2017-Ohio-359, ¶ 22.

{¶ 78} Appellant also challenges the Obey family's identifications based upon the visual images and audio captured on the body cameras worn by Dague and Fleming. (State's Ex. 45). Appellant first notes that Dague's body camera depicts Erin stating that Chatos fought with only one man. Contrary to appellant's suggestion, this statement does not undermine her other testimony that Chatos was assaulted by three men, including appellant; indeed, the "one man" to whom Erin referred may well have been appellant. Appellant next notes that Fleming's body camera depicts Merrie describing her second attacker as a bald African American wearing a white shirt. Appellant argues that because

he is not bald and was not wearing a white shirt at the time of the incident, Merrie's description proves that he was not one of her assailants. The jury was able to view the body camera images of Merrie describing her attackers and could reasonably have discounted her inaccuracies given that it was made in the immediate aftermath of a brutal attack during which she was repeatedly kicked in the head. Again, a jury is free to believe all, part, or none of a witness's testimony. *Johns* at ¶ 17.

{¶ 79} Appellant also challenges the accuracy of the identifications based upon the contrast between the security footage which appears to show Chatos's assailant wearing a light-colored shirt and the still photographs which depict appellant wearing a dark-colored shirt. This subject was thoroughly explored at trial. Indeed, both Richardson and Lemmon acknowledged this discrepancy; however, Lemmon testified that he had learned over his two-decade law enforcement career that the color of clothing depicted in security footage can appear different than the color of clothing in still photographs. The jury heard this testimony and was in the best position to evaluate it. *Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6.

{¶ 80} Appellant further argues that his conviction is against the manifest weight of the evidence because he testified that he was not involved in the attacks against either Chatos or Merrie. Specifically, appellant points to his testimony, which was confirmed by Edwards, that he was in the kitchen being treated for his eye injury when the attacks occurred. However, appellant's admission during the March 9, 2018 interview with Richardson contradicts this testimony; in that interview, appellant admitted that he was involved in the fight, albeit only to defend himself. Furthermore, appellant's testimony is directly contradicted by the testimony provided by the Obey family. We are mindful that the presence of conflicting testimony does not render a conviction against the manifest weight of the evidence. *State v. Johnson,* 10th Dist. No. 19AP-296, 2020-Ohio-4077, ¶ 20, citing *State v. Lindsey,* 10th Dist. No. 14AP-751, 2015-Ohio-2169, ¶ 43. Further, "a conviction is not against the manifest weight of the evidence because the trier of fact believed the state's version of the events over the defendant's version." *State v. Lipkins*, 10th Dist. No. 16AP-616, 2017-Ohio-4085, ¶ 39, citing *State v. Gale*, 10th Dist. No. 05AP-708, 2006-Ohio-1523, ¶ 19. As noted above, the jury may believe all, part, or none of the testimony of each witness appearing before it including that of appellant and the Obey

family. *Johns* at ¶ 17. Mere disagreement over witness credibility is not a sufficient reason to reverse a judgment as being against the manifest weight of the evidence. *Id.*, citing *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 24.

{¶ 81} Finally, we briefly address two additional claims asserted under this assignment of error. Appellant maintains that the trial court improperly denied cross-examination of Chatos regarding his pending civil lawsuit against appellant and others. Appellant contends that the allegations in the lawsuit contradict his trial testimony and suggest a motive for claiming that appellant was his assailant. We first note that this argument does not involve the sufficiency and/or manifest weight of the evidence. Further, this court adheres to the maxim that an appellate court " 'rules on assignments of error, not * * * mere arguments.' " *State v. Hughes*, 10th Dist. No. 19AP-385, 2020-Ohio-3382, ¶ 17, citing *Huntington Natl. Bank v. Burda*, 10th Dist. No. 08AP-658, 2009-Ohio-1752, ¶ 21, citing App.R. 12(A)(1)(b). App.R. 12(A)(1)(b) provides that "a court of appeals shall * * * [d]etermine the appeal on its merits on the assignments of error set forth in the briefs." Appellant did not assert this claim as part of his assignment of error but merely raised it in his argument. Because an appellate court rules on assignments of error and not mere arguments, and because appellant did not raise this issue in his assignment of error, we decline to address it.

{¶ 82} Appellant also raises a claim under the "Issues Presented for Review" section of his brief that the "jury's desire to conclude the case tainted their deliberations and prejudiced them against the defendant." (Appellant's Brief at 29.) Like the alleged improper limitation on cross-examination, this argument also does not involve the sufficiency and/or weight of the evidence. Further, as noted above, this court rules on assignments of error, not mere arguments. App.R. 12(A)(1)(b). In addition, appellant has not developed this argument beyond the statement quoted above. *See* App.R. 16(A)(7). Finally, this court will not speculate on why a jury rendered its verdict. *State v. Cameron*, 10th Dist. No. 10AP-240, 2010-Ohio-6042, ¶ 39, citing *State v. Trewartha*, 165 Ohio App.3d 91, 2005-Ohio-5691, ¶ 15-16 (10th Dist). For all these reasons, we decline to address this issue.

{¶ 83} For the foregoing reasons, we find that appellant's convictions for felonious assault are supported by sufficient evidence and are not against the manifest weight of the evidence. Accordingly, appellant's second assignment of error is overruled.

{¶ 84} In his third assignment of error, appellant contends that the trial court erred in denying his motion for mistrial following the removal of one juror and substitution of an alternate juror during jury deliberations. We disagree.

{¶ 85} " ' "A mistrial should not be ordered in a criminal case merely because error or irregularity has intervened, unless the substantial rights of the accused or the prosecution are adversely affected." ' " *State v. Nichols*, 10th Dist. No. 19AP-113, 2020-Ohio-4362, ¶ 24, quoting *State v. Walburg*, 10th Dist. No. 10AP-1087, 2011-Ohio-4762, ¶ 52, quoting *State v. Reynolds*, 49 Ohio App.3d 27, 33 (2d Dist.1988). "Rather, a trial court should only declare a mistrial when 'the ends of justice so require and a fair trial is no longer possible.' " *Id.*, quoting *State v. Franklin*, 62 Ohio St.3d 118, 127 (1991). "An appellate court reviewing a trial court's decision on a motion for mistrial defers to the judgment of the trial court, as it is in the best position to determine whether circumstances warrant a mistrial." *Id.* at ¶ 23, citing *State v. Glover*, 35 Ohio St.3d 18, 19 (1988). Thus, this court reviews a trial court's decision on a motion for mistrial for an abuse of discretion. *Id.*, citing *Columbus v. Aleshire*, 187 Ohio App.3d 660, 2010-Ohio-2773, ¶ 42 (10th Dist.), citing *State v. Sage*, 31 Ohio St.3d 173, 182 (1987).

{¶ 86} Following its charge to the jury, the trial court informed the two alternate jurors that they would remain alternate jurors until the jury reached a verdict; if their service was required, they would then be impaneled with the regular jurors and deliberations would start anew. The court then instructed the bailiff to escort the alternate jurors from the courtroom. Thereafter, the court generally advised the regular jurors about the deliberative process, i.e., deliberating as a collective body, taking breaks, choosing a foreperson, etc. During this discussion, the court noted "it's my understanding somebody has a 4:00 meeting that they have to be at. * * * So take that into consideration." (Tr. at 1550.)

{¶ 87} At 11:52 a.m., the jury began its deliberations. At 1:42 p.m., the jury requested an electronic device in order to review the video evidence; with agreement of counsel, the court provided the requested device. At 3:39 p.m., the trial court addressed one of the

regular jurors in open court: "[Juror H], it's my understanding you have work commitments and can no longer serve." Juror H responded, "Correct." *Id.* at 1562. The court asked the prosecutor and both defense counsel if there was any objection to releasing Juror H and substituting one of the alternate jurors [Juror J]. No objection was lodged. The court then excused Juror H and swore in Juror J as a regular juror. Thereafter, the court advised the jury, "You guys get to start anew. All over from the scratch. [Juror J] hasn't had the benefit of your wisdom. Okay? So with that, you're excused to go back." *Id.* at 1563. At 3:40 p.m., the jury resumed deliberations.

{¶ 88} At 3:45 p.m., the court met with the excused juror, Juror H, outside the presence of the defendants, counsel, and jury. Juror H averred that during the jury's discussions concerning the timetable for deliberations, she reported that she had to leave by 4:30 p.m. She further averred that at this point, the jury was "not in agreement" and that she was the one "holding up the agreement." *Id.* at 1565-66. Juror H further asserted that the jury concluded that it would have to reach a verdict by 3:30 p.m. in order to accommodate Juror H's 4:30 p.m. departure time. According to Juror H, the jury foreperson indicated that she wanted to "push through" with the deliberations because she had to catch a flight at 7:30 p.m.; accordingly, the foreperson suggested replacing Juror H with an alternate juror. When the court asked Juror H if she was "bullied," she responded "possibly." *Id.* at 1566. She reiterated that she was the only juror voting for acquittal. The court averred that she should have addressed her concerns to the court during the previous discussion about excusing her.

{¶ 89} At 3:51 p.m., the trial court informed counsel of the conversation with Juror H. Both defense counsel moved for a mistrial, arguing that given Juror H's allegations about coercion, the alternate juror might be similarly coerced into voting to convict. The prosecutor opposed the motion, arguing that Juror H asked to be excused, the parties accepted her proffered excuse, and an alternate juror had been substituted.

{¶ 90} The trial court then placed Juror H under oath and permitted her to explain what had occurred. To that end, Juror H averred that prior to deliberations, she informed the jury she had to leave by 4:30 p.m. During deliberations, she was the only juror who was voting for acquittal. At 3:10 p.m., the foreperson informed the bailiff that because the jury likely would be deliberating past Juror H's stated departure time and the jury wanted to

reach a verdict that day, an alternate juror might be needed.  *Id.* at 1575.  The jury agreed with this course of action.

{¶ 91}  Upon questioning by the prosecutor, Juror H indicated that had the jury been unable to reach a verdict by 4:30 p.m., she would have suggested resuming deliberations the next day.  However, other jurors indicated that they had conflicts the next day and would like to resolve the matter that day.  Juror H averred that she did not ask to be excused from the jury.  When asked why she did not disclose this information when the court originally questioned her, she stated "I feel like I'm outnumbered up here."  *Id.* at 1579.  She also stated that she would not have felt comfortable rejoining the jury because "I'm the only one who's holding up their progress."  *Id.*  Appellant's counsel asked Juror H if she believed the foreperson's request that she no longer serve on the jury "was a way of freezing you out of the deliberations."  *Id.* at 1580.  Juror H replied, "I think it's possible."  *Id.*  The trial court stated that it would investigate the matter and excused Juror H from the courtroom.

{¶ 92}  Shortly thereafter, the trial court informed counsel that the jury had in the last five minutes indicated that it had reached a verdict.  The prosecutor suggested that the court voir dire the remaining 11 jurors prior to ruling on the motion for mistrial.  Counsel for appellant renewed the motion for mistrial, arguing that "it seems suspect that the new juror who came up was there for less than 50 minutes, and there's no way that they could have reviewed the things that they even asked for earlier with her in that time frame."  *Id.* at 1583.  Counsel further contended that he was never informed that Juror H had suggested that the jury cease deliberations only for the evening and reconvene the next day.  Counsel also argued against voir dire of the remaining jurors.

{¶ 93}  The trial court determined that it would voir dire the remaining 11 jurors individually.  Prior to questioning each juror, the court explained that Juror H had reported that she felt she was coerced and had been forced off the jury because she was the sole vote for acquittal.

{¶ 94}  The first juror questioned, Juror E, stated that"[t]here was no coercion or anything like that.  We deliberated, and it looked like it was going to go on and on."  *Id.* at 1588.  Because other jurors had indicated that they could not come back the next day, the jury concluded that it would be better to "push this through and stay late."  *Id.*  Juror E acknowledged that Juror H was the sole juror voting for acquittal and that the other 11

jurors were convinced of guilt beyond a reasonable doubt; however, those 11 jurors did not try to force Juror H to adopt a different position. He denied that Juror H was told she was being replaced by an alternate juror; rather, the jury "hashed it out." *Id.* at 1589. Juror E indicated that the reconstituted jury had reached a unanimous verdict.

{¶ 95} Juror S averred that after Juror H indicated that she had to leave by 4:30 p.m., the foreperson asked the bailiff how much time would be involved in the post-verdict process, i.e., assembling in the courtroom, reading the verdict, de-briefing the jury, etc. The bailiff's response prompted the realization that Juror H's 4:30 p.m. departure time left only 10 to 15 minutes to deliberate that day. The jury, including Juror H, concluded that it could not reach a verdict within that timeframe. Because other jurors had conflicts the next day, it was decided an alternate juror was required. Juror S further indicated that although Juror H did not expressly state as much, it was assumed that she could return the next day and continue deliberations.

{¶ 96} Juror B, the foreperson, denied that Juror H was coerced and forced off the jury. Juror B averred that the jury contemplated an "alternate juror situation" as soon as Juror H announced her 4:30 p.m. departure deadline because there were other jurors who had conflicts with resuming deliberations the next day. Juror B stated that the jury had begun deliberations and had taken a preliminary vote; however, that vote was "by no means * * * anything final." *Id.* at 1599. At approximately 3:00 p.m., the jury discussed the timeline of the deliberations and post-verdict process and determined that to accommodate Juror H's 4:30 p.m. departure time, it would need to reach a verdict in the next 10 to 20 minutes. The jury, including Juror H, "took a vote and said that we would like to actually push on so that we could get either further deliberations done today with the alternate juror, that we knew we were going to have to bring in regardless, and the rest of us wanted to * * * stay and continue to kind of talk through it. We didn't have the same * * * stopping time as what her constraints were for the day." *Id.* at 1600. The trial court confirmed with Juror B that "this was an open vote in the room * * * and Juror H agreed." Juror B replied, "Absolutely, yeah. This was not anything of coercion." *Id.*

{¶ 97} When questioned by counsel for appellant as to what Juror H "agree[d] to," Juror B averred that "[s]he agreed that she had her conflict and * * * so we talked about what the different scenarios would be in bringing in an alternate this evening and restarting

the deliberation process. * * * She kind of stated again that she had that conflict. She wasn't going to be able to move that or make any changes to that, and that the rest of us * * * said we wanted to push on." *Id.* at 1600-01. Juror B acknowledged that Juror H stated only that she could not continue deliberations that day; she did not aver that she could not deliberate the next day.

{¶ 98} Following Juror B's testimony, the trial court stated, "I have a real problem if they voted amongst themselves to do it and then [Juror H] cries sour grapes afterwards. * * * [Juror B] indicated in her testimony that they voted inside that this is what they were going to do as a group. * * * [I]f [Juror H] wanted to go and they were going to bring in an alternate and everybody voted on that back there." (Tr. at 1604-05.) The court then continued its voir dire of the individual jurors.

{¶ 99} Juror N testified that the jury as a whole voted to replace Juror H with an alternate. When the trial court asked if Juror H "voted positively" and was "okay with the decision," Juror N replied "[y]es." *Id.* at 1606. Juror N denied that the jury discussed time constraints involving the verdict and post-verdict process.

{¶ 100} Following Juror N's testimony, the trial court asserted, "Quite frankly, I've think I've heard enough. I think I want to take the verdict, [take the] motion * * * under advisement, and argue it * * * in the morning." *Id.* at 1608. The court then asked defense counsel if more voir dire was necessary; both counsel answered in the negative. However, counsel for appellant averred, "I just don't believe that we're going to get around this group-think mentality. * * * I highly doubt that any juror is going to come in here and potentially say, Yeah, we forced her to get off of here. * * * [A]nd * * * if [the bailiff] would have come to me and said they want to bring up an alternate because [Juror H] wants to leave and go to work at 4:30 but she wants to keep deliberating, there's no way I would have agreed to bringing up an alternate." *Id.* at 1609.

{¶ 101} Thereafter, the court averred, "I am satisfied with the following facts that I hear: I hear that it was a mutual vote inside from two of the jurors. It wasn't mentioned by the other two. But I thought that the third one was probably the most trustworthy of all. * * * [Juror B] indicated there was a vote taken [and] everybody was in agreement that [Juror H] was going to step off. Where [Juror H] gave the opposite indication where she was forced out. * * * And I have a real problem with that. * * * I still

have the dilemma of an allegation of being forced out. * * * And that's why I wanted to hold * * * the motion for mistrial in abeyance until tomorrow * * * when we * * * all have some time to do a little research and have an argument and make a decision. I may still well mistry this case." *Id.* at 1611-12.

{¶ 102}          Thereafter, at 5:06 p.m., the jury announced its verdicts. The jury found both appellant and Fife guilty of felonious assault as charged in the indictments. At defense counsel's request, the jury was polled; all 12 jurors confirmed the verdicts.

{¶ 103}          The next day, the prosecutor filed a written memorandum opposing the motion for mistrial. The trial court held a hearing on the matter during which the parties argued their respective positions. The court took the matter under advisement and issued a written decision the next day. Therein, the court set forth a detailed recitation of the proceedings related to the removal of Juror H. The court concluded that the circumstances surrounding the replacement of Juror H with an alternate juror did not warrant a mistrial. The court stated:

> The facts presented to the Judge at the time of the removal convinced this Judge that [Juror H] would no longer be able to perform her duty as a juror. [Juror H] consistently indicated that she had a scheduling conflict which prevented her from continuing deliberations beyond 4:00 p.m. on May 6, 2019. At approximately 3:00 p.m., the remainder of the jury wished to proceed with deliberations beyond 4:00 p.m.
>
> Thus, an alternate juror was put in place with instructions to start deliberations anew, and there is no evidence before the Court that they did not do so. With that directive, the Court finds that Defendants received the fair trial to which they were entitled.
>
> The fact that [Juror H] came forward after her removal with allegations of misconduct does not change this result.

(May 8, 2019 Entry denying Def's. Mot. for Mistrial at 3.)

{¶ 104}          As noted above, appellant's motion for mistrial was based on the trial court's alleged wrongful substitution of Juror H with an alternate juror. Appellant first contends that the substitution was without cause and constitutes reversible error. Specifically, citing *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, appellant argues that "[w]hen a juror is challenged for cause, such as it is alleged as to [Juror H], a reviewing

court will not disturb a trial court's ruling 'unless it is manifestly arbitrary and unsupported by substantial testimony, so as to constitute an abuse of discretion.' " (Appellant's Brief at 50.) Appellant argues that "there was not even a semblance of 'substantial testimony' here." *Id.* Appellant's reliance on the "substantial testimony" standard in *Jackson* is misplaced, as that case addressed excusing a prospective juror in a capital case.

{¶ 105}        Instead, the present case involves the removal and replacement of jurors, which is governed by Crim.R. 24(G) and R.C. 2945.29. *State v. Zaragoza*, 2d Dist. No. 26706, 2016-Ohio-144, ¶ 18. R.C. 2945.29 permits a trial court to replace a juror with an alternate "[i]f, before the conclusion of the trial, a juror becomes sick, or for other reason is unable to perform his duty[.]" Crim.R. 24(G)(1) similarly provides that alternate jurors "shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties." Moreover, Crim.R. 24(G)(1) permits a trial court to replace a juror after deliberations have begun. "If an alternate replaces a juror after deliberations have begun, the court must instruct the jury to begin its deliberations anew." Crim.R. 24(G)(1). " 'The purpose of such instruction is to negate any possibility of coercion or intimidation of the substitute juror.' " *State v. Sales-Hilton*, 9th Dist. No. 26351, 2012-Ohio-5651, ¶ 16, quoting *State v. Elersic*, 11th Dist. No. 2000-L-061. "A trial judge is empowered to exercise 'sound discretion to remove a juror and replace him with an alternate juror whenever facts are presented which convince the trial judge that the juror's ability to perform his duty is impaired.' " *State v. Brown*, 2d Dist. No. 24541, 2012-Ohio-1848, ¶ 46, quoting *State v. Hopkins*, 27 Ohio App.3d 196, 198 (11th Dist.1985). "Absent a record showing that the court abused that discretion which resulted in prejudice to the defense, the regularity of the proceedings is presumed." *Id.,* citing *Beach v. Sweeney*, 167 Ohio St. 477 (1958).

{¶ 106}        Upon review of the record, we find no abuse of discretion in either the trial court's decision to replace Juror H with Juror J or in the trial court's denial of the motion for mistrial based upon that decision. The facts established that Juror H had a scheduling conflict which precluded her continued participation in deliberations. Indeed, in the colloquy preceding removal, the trial court expressly stated, "it's my understanding you have work commitments and can no longer serve." Juror H responded, without hesitation, "correct." The trial court, exercising its sound discretion, accepted that

assertion. Juror H did not advise the court that she could participate in deliberations the next day, that there was coercion by fellow jurors to conform to their view of the evidence, or that she was forced off the jury. Those matters were raised by Juror H only after the substitution was made and she was no longer a member of the jury. Appellant points to no legal authority requiring a trial court to consider post-substitution allegations. However, as detailed above, the trial court conducted a thorough and painstaking review of Juror H's post-substitution allegations which included voir dire of Juror H and four of the remaining jurors. During that questioning, Juror H alleged only the possibility of coercion, and the remaining jurors denied that Juror H was coerced or forced off the jury. In addition, the trial court held a hearing at which counsel was permitted to argue their respective positions at length.

{¶ 107} We also note that after the substitution was made and the alternate juror was seated, the court correctly instructed the jury, pursuant to Crim.R 24(G)(1), that it was required to begin its deliberations anew. Appellant acknowledges the trial court's technical compliance with Crim.R. 24(G)(1). However, he contends that "it is highly improbable, if not impossible, that the 'new' jury began deliberations anew with the full jury present." (Appellant's Brief at 51.) Appellant advances three bases for this contention: (1) that the jury returned its verdict less than one hour after the alternate juror was seated; (2) that "the original jurors had looked at tapes for some time," and (3) that the trial court "had segregated the jurors during its questioning of them." *Id.* The trial court instructed the jury to begin deliberations anew after the alternate juror was seated. We presume the jury followed this instruction. *State v. Clark*, 10th Dist. No. 19AP-300, 2021-Ohio-559, ¶ 66, citing *State v. Raglin*, 83 Ohio St.3d 253, 264 (1998). Further, there is no evidence in the record establishing that deliberations occurred without the full jury being present or that the jury failed to properly consider all the admitted evidence. Moreover, we will not speculate about the reasons for the length of time the jury deliberated.

{¶ 108} For the foregoing reasons, we find that the trial court did not abuse its discretion in replacing Juror H with an alternate juror or in denying appellant's motion for mistrial. Accordingly, appellant's third assignment of error is overruled.

{¶ 109} In his fourth assignment of error, appellant asserts that he was denied his constitutional right to the effective assistance of counsel. Specifically, appellant

maintains that counsel was ineffective in: (1) failing to understand the nature of the charges against him and the manner/means by which he could be convicted, i.e, that he could be convicted of felonious assault either as a principal offender or as a complicitor, and (2) failing to question Juror H before he agreed to her removal from the jury. Appellant contends that counsel's combined errors resulted in substantial prejudice necessitating reversal of his convictions.

{¶ 110}        To establish a claim of ineffective assistance of counsel, appellant must demonstrate that counsel's performance was deficient, and that counsel's deficient performance prejudiced him. *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, ¶ 133, citing *Strickland v. Washington*, 466 U.S. 668 (1984). The failure to make either showing defeats a claim of ineffective assistance of counsel. *State v. Bradley*, 42 Ohio St.3d 136, 143 (1989), citing *Strickland* at 697.

{¶ 111}        To demonstrate deficient performance, appellant must prove that counsel's performance fell below an objective standard of reasonable representation. *Jackson* at ¶ 133. In other words, appellant must prove that counsel made errors " 'so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' " *State v. Thompson*, 10th Dist. No. 18AP-211, 2019-Ohio-2525, ¶ 13, quoting *Strickland* at 687. Appellant must overcome the strong presumption that defense counsel's performance falls within a wide range of reasonable professional assistance. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 101, citing *Strickland* at 689.

{¶ 112}        "To show prejudice, the appellant must establish that but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different." *State v. Jones*, 10th Dist. No. 18AP-33, 2019-Ohio-2134, ¶ 50, citing *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, ¶ 204. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, ¶ 82, citing *Strickland* at 694.

{¶ 113}        Appellant first argues that his counsel was deficient for objecting to the state's pursuit of its case against him under a complicity theory. Appellant contends that this objection demonstrated appellant's lack of knowledge of Ohio law which allows for conviction either as a principal offender or an aider or abettor. Appellant maintains that based on this misunderstanding of the law, "[i]t must be presumed, therefore, that defense

counsel's advi[c]e to [appellant] during trial, including but not limited to that which resulted in [appellant] declining the State's offer to allow him to enter a guilty plea to one charge in the indictment substantially prejudiced [appellant]." (Appellant's Brief at 54-55.)

{¶ 114}        Although the record indicates that appellant declined the plea offer, the record does not contain any information about advice counsel may have provided appellant regarding that decision.  Because a claim of ineffective assistance of counsel arising from any advice counsel may have provided about accepting or rejecting a plea relies on matters outside the record, such a claim would not be appropriate on direct appeal.  *See State v. Davis*, 10th Dist. No. 05AP-193, 2006-Ohio-5039, ¶ 19 ("When allegations of ineffective assistance of counsel hinge on facts not appearing in the record, the proper remedy is a petition for post-conviction relief rather than a direct appeal.").

{¶ 115}        Further, assuming for purposes of analysis that appellant could establish deficient performance by counsel in his handling of the complicity issue, he still must demonstrate that it resulted in prejudice to him.  The jury was instructed that appellant could be convicted of felonious assault as a principal offender or as a complicitor; however, the written jury verdicts do not reveal under which theory the jury found appellant guilty.  "[I]t is not for an appellate court to speculate about why a jury decided as it did." *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, ¶ 291, citing *State v. Lovejoy*, 79 Ohio St.3d 440, 445 (1997).  " ' "Courts have always resisted inquiring into a jury's thought processes * * *; through this deference the jury brings to the criminal process, in addition to the collective judgment of the community, an element of needed finality." ' " *Id.*, quoting *Lovejoy*, quoting *United States v. Powell*, 469 U.S. 57, 66-67 (1984).  Further, in weighing the nature and circumstances of the offenses, particularly the testimony of the Obey family that appellant punched and kicked Chatos and kicked Merrie in the head, the jurors reasonably could have concluded that appellant was the principal offender. Thus, appellant was not prejudiced by counsel's handling of the complicity issue.

{¶ 116}        Appellant also argues that his trial counsel was deficient for failing to question Juror H before he agreed to her removal as a juror.  In support of his argument, appellant cites counsel's assertion at the hearing on the motion for mistrial that he would have questioned Juror H had he been properly apprised of the circumstances precipitating the removal.  To be sure, defense counsel advanced this argument, albeit in hindsight, in

conjunction with the motion for mistrial. However, at the time of the removal, Juror H represented to the parties and the court only that she had a scheduling conflict which precluded her continued jury service; she provided no other information. Given the reason asserted by Juror H, no further inquiry was necessary. Under these circumstances, counsel was not deficient in failing to further question Juror H.

{¶ 117} Moreover, even if appellant could establish deficient performance, he still must demonstrate that but for counsel's unprofessional error, there is a reasonable probability that the outcome of the trial would have been different. Such a finding would require this court to assume that further inquiry by counsel would have altered the trial court's decision to remove Juror H and that Juror H's presence on the jury would have resulted in, at the very least, a hung jury. We decline to engage in such rank speculation.

{¶ 118} For the foregoing reasons, we conclude that appellant has failed to demonstrate that he was denied his constitutional right to the effective assistance of counsel. Accordingly, appellant's fourth assignment of error is overruled.

{¶ 119} In his fifth assignment of error, appellant argues that the trial court erred in its imposition of sentence. Appellant complains that the trial court imposed a harsher sentence on him than that imposed on Fife. Appellant also claims that his sentence was constitutionally infirm because it was based on factual findings made by the trial court rather than the jury.

{¶ 120} "An appellate court will not reverse a trial court's sentencing decision unless the evidence is clear and convincing that either the record does not support the sentence or that the sentence is contrary to law." *State v. Robinson*, 10th Dist. No. 15AP-910, 2016-Ohio-4638, ¶ 7, citing *State v. Chandler*, 10th Dist. No. 04AP-895, 2005-Ohio-1961, ¶ 10; R.C. 2953.08(G)(2).

{¶ 121} Because appellant did not object to his sentence at the sentencing hearing, he has waived all but plain error. *State v. Bland*, 10th Dist. No. 19AP-826, 2020-Ohio-4662, ¶ 18, citing *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 152. Under Crim.R. 52(B), "plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." An appellate court recognizes plain error "with the utmost caution, under exceptional circumstances and only to prevent a miscarriage of justice." *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). Plain error is not

present unless, but for the error complained of, the outcome would have been different. *State v. Pilgrim*, 184 Ohio App.3d 675, 2009-Ohio-5357, ¶ 58 (10th Dist.).

{¶ 122}        Appellant was sentenced to an aggregate prison term of nine years. Appellant asserts in his briefing that Fife was sentenced to an aggregate term of eight years. Appellant argues that he "was improperly sentenced to a term one year longer than his co-defendant who was undisputedly the instigator and primary actor in the incident at issue." (Appellant's Brief at 56.)  Although the transcript of the sentencing hearing in appellant's case reveals that the prosecutor argued for a longer sentence for appellant than for Fife, the sentencing transcript for Fife is not included in the appellate record in appellant's case. Accordingly, on the record before us, we are not privy to the trial court's rationale for sentencing Fife to an eight-year aggregate term of imprisonment.

{¶ 123}        Assuming that Fife was sentenced to one year less than appellant, appellant's contention implicates R.C. 2929.11(B), which requires a trial court to impose a felony sentence that is "consistent with sentences imposed for similar crimes committed by similar offenders."  R.C. 2929.11(B).  "As used in this provision, ' "consistency" relates to the sentences in the context of sentences given to other offenders * * *.' "  *State v. Walker*, 3d Dist. No. 5-20-13, 2020-Ohio-4512, ¶ 7, quoting *State v. Moore*, 8th Dist. No. 99788, 2014-Ohio-5135, ¶ 16.  However, consistency does not necessarily require uniformity.  *State v. Hall*, 179 Ohio St.3d 727, 2008-Ohio-6228, ¶ 10 (10th Dist.)  " 'R.C. 2929.11(B) does not require a trial court to impose identical sentences for codefendants.' "  *Walker* at ¶ 7, quoting *State v. McIntosh*, 160 Ohio App.3d 544, 2005-Ohio-1760, ¶ 13 (1st Dist.).

{¶ 124}        " 'The fact that a defendant receives a longer prison sentence than a codefendant does not, in and of itself establish a violation of the consistency requirement.' " *Id.* at ¶ 8, quoting *State v. Luce*, 5th Dist. No. 19-COA-001, 2019-Ohio-2875, ¶ 22, quoting *State v. Ware*, 8th Dist. No. 106176, 2018-Ohio-2294, ¶ 17.  "[I]n order to demonstrate a sentence is inconsistent or disproportionate under R.C. 2929.11(B), a defendant 'must demonstrate that the trial court failed to properly consider the statutory sentencing factors and guidelines found in R.C. 2929.11 and 2929.12.' "  *State v. Murphy*, 10th Dist. No. 12AP-952, 2013-Ohio-5599, ¶ 13, quoting *State v. McMichael*, 10th Dist. No. 11AP-1042, 2012-Ohio-3166, ¶ 42.

{¶ 125}        Appellant does not argue that the trial court failed to properly consider the statutory sentencing factors and guidelines found in R.C. 2929.11 and 2929.12. Further, even if appellant had asserted such an argument, this court has determined that a notation in a trial court's judgment entry signaling that it considered the purposes of principles of sentencing under R.C. 2929.11 " 'is sufficient to satisfy the consistency requirement in R.C. 2929.11(B).' " *State v. Alexander*, 10th Dist. No. 16AP-761, 2017-Ohio-4196, ¶ 13, quoting *State v. Hayes*, 10th Dist. No. 08AP-233, 2009-Ohio-1100, ¶ 11. The judgment entry in this case indicates that the trial court considered the purposes and principles of sentencing set forth in R.C. 2929.11. Accordingly, appellant's consistency argument under R.C. 2929.11(B) is without merit.

{¶ 126}        Appellant also claims that his sentence was constitutionally infirm because it was based on factual findings made by the trial court rather than the jury in contravention of *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), and *Blakely v. Washington*, 542 U.S. 296 (2004). Appellant cites the following statement made by the trial court:

> Mr. Moore, when you testified I heard what you said. You and I suffer from a similar ailment. We walk on the outsides of our feet. A very small part of our population do that, and it kind of stuck out to me. So I think you were the one that drop kicked that head, just from the way the person walked up and the way it was executed, plus you fit the general format. You know, that was one of the reasons I think [the sentence is] appropriate.

(June 24, 2019 Sentencing Hearing Tr. at 19.)

{¶ 127}        Although appellant's argument does not expressly reference consecutive sentences, review of the record reveals that the foregoing statement was made in the context of the trial court imposing consecutive sentences.

{¶ 128}        While appellant cites to *Apprendi* and *Blakely* for the proposition that a trial court is precluded from making factual findings, this principle does not apply to judicial factfinding regarding consecutive sentences. As the Supreme Court of Ohio has recognized, its prior understanding that *Apprendi* and *Blakley* stood for the proposition that "requiring judicial factfinding prior to imposing consecutive sentences violated the Sixth Amendment guarantee of trial by jury" was "dispelled in *Oregon v. Ice* [555 U.S. 160

(2009)]." *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, ¶ 2, 18, citing *State v. Foster*, 109 Ohio St. 1, 2006-Ohio-856. The *Bonnell* court recognized that in *Ice*, the United States Supreme Court held that judicial fact-finding before imposing consecutive sentences is constitutionally permissible. *Id.* at ¶ 18, citing *Ice* at 171-72. In fact, *Bonnell* states that "judicial fact-finding is * * * required to overcome the statutory presumption in favor of concurrent sentences." *Bonnell* at ¶ 23.

{¶ 129} In performing the factfinding necessary to impose consecutive sentences, it is proper for a trial court to consider " 'the record, and information presented at the hearing, any presentence investigation report, and any victim impact statement.' " *State v. Jirousek*, 11th Dist. No. 2013-G-3128, 2013-Ohio-5267, ¶ 49, quoting *State v. Mathis*, 109 Ohio St.3d 54, 2006-Ohio-855, ¶ 37. Contrary to appellant's assertion, in making its consecutive sentence determination, the trial court could properly consider the evidence pertaining to the bar fight which led to the felonious assault charges. That evidence included the surveillance footage referenced by the trial court.

{¶ 130} For the foregoing reasons, we conclude that appellant has failed to establish by clear and convincing evidence that the trial court's sentencing decision was either not supported by the record or was contrary to law. Accordingly, appellant's fifth is overruled.

{¶ 131} Having overruled appellant's first, second, third, fourth, and fifth assignments of error, we hereby affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BEATTY BLUNT and BROGAN, JJ., concur.

BROGAN, J., retired, of the Second Appellate District, assigned
to active duty under authority of Ohio Constitution, Article IV,
Section 6(C).