[Cite as *State v. Fife*, 2021-Ohio-2000.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                    :

     Plaintiff-Appellee,              :

                                No. 19AP-470

v.                                               :         (C.P.C. No. 18CR-1691)

James D. Fife,                                   :        (REGULAR CALENDAR)

     Defendant-Appellant.             :

D E C I S I O N

Rendered on June 15, 2021

**On brief:** [*G. Gary Tyack*], Prosecuting Attorney, and *Kimberly M. Bond*, for appellee.

**On brief:** *Jeremy A. Roth*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

BROGAN, J.

{¶ 1} Defendant-appellant, James D. Fife ("appellant"), appeals a judgment of the Franklin County Court of Common Pleas convicting him, pursuant to jury verdict, of two counts of felonious assault. Finding no merit to the appeal, we affirm.

{¶ 2} By indictment filed April 9, 2018, plaintiff-appellee, State of Ohio, charged Fife with two counts of felonious assault in violation of R.C. 2903.11, felonies of the second degree, for knowingly causing serious physical harm to Chatos Obey ("Chatos") and Merrie Obey ("Merrie"). Fife pleaded not guilty and requested a jury trial. Fife was tried jointly

with co-defendant Jordan D. Moore, Sr. and they were represented by separate counsel. This court addressed Moore's appeal in *State v. Moore*, 10th Dist. No. 19AP-464, 2021-Ohio-1379, eliciting a statement of facts common to the present case, as follows.

{¶ 3} The state presented the following evidence in its case-in-chief. Chatos testified that on December 31, 2017, he and his then-fiancé (now wife), Erin Palmer ("Erin"), his sister, Ashley Green ("Ashley"), his mother, Merrie, and Merrie's partner, Michelle White ("Michelle"),[1] celebrated New Year's Eve at Rosie O'Grady's, a restaurant/bar located on Morse Road in Columbus. The group was there for several hours, eating, drinking, and playing pool. Just after midnight on January 1, 2018, the family walked outside to the patio area to smoke. Chatos saw Fife, and the two made eye contact. According to Chatos, Fife said "what the F you looking at?" (Tr. at 405.) Chatos told Ashley that he met Fife while the two were in jail together,[2] and that Fife did not like him.

{¶ 4} Chatos and his family decided to leave the bar. Because there was no exit from the patio to the parking lot, they had to walk back inside the bar in order to leave through the front entrance. Chatos led his group through the walkway from the patio to the bar. Once inside, Chatos was immediately "picked up * * * 10 feet off the ground [and] slammed onto the ground" by the bouncer. *Id.* at 411. He was then "just getting wailed on. I couldn't see. It was just blows * * * hitting me left and right." *Id.* Chatos identified his assailants as "James Fife, his group, Jordan Moore, the [bouncer]." *Id.* at 412. He testified that he "caught glimpses" of his assailants as he was "getting tossed around." *Id.* The

---

[1] Where appropriate, we collectively refer to Chatos, Erin, Ashley, Merrie, and Michelle as "the Obey family."

[2] Jacob Stanley, a Corrections Officer with the Franklin County Sheriff's Office, confirmed that Chatos and Fife were housed together in the Franklin County Jail for three days in April 2016 (State's Ex. 46(a) and 46(b)).

assailants kicked him and hit him with their fists. Chatos and Erin were then pushed out the front door into the parking lot. Because the rest of the family was still inside the bar, Chatos and Erin remained in the parking lot. Chatos spoke to the bouncer, who apologized about what had happened. Immediately thereafter, Fife, Moore, and a large, light-skinned African American man with braids, later identified as Daquan Shropshire ("Shropshire"),[3] "jumped" Chatos in the parking lot and beat him unconscious. *Id.* at 413. By the time he regained consciousness, all three assailants had left the scene. Chatos and Erin sat inside their vehicle and waited for his family members to emerge from the bar.

{¶ 5} Police soon arrived at the scene. Chatos had difficulty answering their questions because his jaw was broken and he was in tremendous pain. He observed Merrie being placed in an ambulance. Chatos sat in the ambulance with Merrie for a while but refused medical treatment for himself. He eventually drove Erin home and then asked his brother to drive him to the hospital. Hospital personnel confirmed his jaw was broken; he had surgery the next morning to repair it, which involved wiring his jaw closed.

{¶ 6} Chatos identified State's Ex. 28, a DVD containing security footage of Rosie O'Grady's during the relevant time period.[4] The surveillance video was played during trial. According to Chatos, it depicts the security guard picking him up and slamming him to the floor as he re-entered the bar from the patio. While he was on the floor, he was punched and kicked by four individuals. The security footage then shows Chatos and Erin being pushed out the front door into the parking lot and Chatos being pushed to the ground, hit,

---

[3] Shropshire passed away prior to trial.

[4] The parties stipulated that the security footage was "clarified" for purposes of trial presentation by Jeff Brenner at the Bureau of Criminal Investigation. (Tr. at 429.)

and kicked. Chatos identified Moore, Fife, and Shropshire as the men in the video walking out the front door into the parking lot and then assaulting him.

{¶ 7} Chatos further testified that Ashley later found photographs of Moore, Fife, and Shropshire on Facebook and showed them to him; he identified them as the individuals who assaulted him. On January 4, 2018, he was interviewed by two Columbus Police detectives. During that interview, Chatos was shown three photo arrays; he identified Moore, Shropshire, and Fife as the three men who assaulted him at Rosie O'Grady's. At trial, he expressly averred that his photo array identifications of Moore and Fife were not based upon viewing their photographs on Facebook; rather, he identified them because they were the individuals who assaulted him. He further testified that he was "100 percent" certain of his identifications. *Id.* at 469, 479. In doing so, he reiterated that he previously knew Fife from jail. *Id.* at 472.

{¶ 8} Chatos identified photographs taken by the detectives which depict the injuries he sustained in the fight, including his wired broken jaw. (State's Ex. 7-11.) Chatos testified that he believed his jaw was broken during the fight inside the bar; however, he further averred "outside I think really helped it get broke." (Tr. at 477.) Chatos denied that he provoked the fight or did anything to cause the bouncer to throw him to the floor. He provided in-court identification of Fife as one of the individuals who assaulted him at the bar. *Id.* at 477.

{¶ 9} Erin, Merrie, Michelle, and Ashley also testified about the incident. Much of their testimony corroborated that provided by Chatos and each other, with some exceptions, additions, and differences. According to Erin, while she and her family were outside on the patio, Fife walked outside with some other men. Chatos told her that he knew Fife from jail and "had a problem with him." *Id.* at 588. After Fife and Chatos said

"what's up" to each other, Erin feared that "something's about to happen." *Id.* at 587-88. Because she did not want her family to be involved in a fight, she pushed Chatos toward the door leading into the bar. Once inside, the bouncer threw Chatos into the air. She "didn't see anything" after Chatos was thrown into the air because she had dropped her engagement ring and was searching for it on the floor. *Id.* at 589. After locating her ring, she saw the bouncer push Chatos out the door into the parking lot. Erin followed Chatos and chastised the bouncer for his actions. The bouncer apologized to her and Chatos.

{¶ 10} Shortly thereafter, Fife, Moore, and Shropshire walked into the parking lot. Erin identified the three men on the security footage. (State's Ex. 28.) Moore and Fife pushed her to the ground and started "beating [Chatos] crazy." (Tr. at 592.) The men were "beating on him on the ground, kicking him, stomping him in his face, and he's just laying there." *Id.* Erin walked inside the bar and saw Merrie with her face covered in blood. She then walked back to the parking lot and saw Fife. She encouraged Chatos to fight Fife "one-on-one," which he did. *Id.* at 594. Moments later, Moore joined Fife in fighting Chatos. Erin walked to her vehicle and retrieved her gun from under the passenger seat. She ultimately decided not to use the gun and placed it back under the seat. She walked back into the bar and asked Merrie what had happened to her. At that point, the police arrived; Erin told them what had happened to Chatos and took them to him. Erin encouraged Chatos to report what had happened, but he told her he could not talk or move. He refused transport to the hospital. Chatos and Erin then drove home. Erin passed out because she was drunk; Chatos' brother drove him to the hospital.

{¶ 11} The next day, she and Ashley visited Chatos in the hospital. In an effort to identify his assailants, Chatos stated that he thought the first name of the man with whom

he had been in jail began with a "J."  *Id.* at 604.  They eventually found Fife's Facebook page, which included several photographs of him and Moore.

{¶ 12} From photo arrays presented by the police on January 4, 2018, Erin identified Moore, Shropshire, and Fife as the three men who assaulted Chatos at Rosie O'Grady's.  At trial, she expressly stated that her photo array identifications were not based upon viewing their photographs on Facebook; rather, she identified them because they had assaulted Chatos.  *Id.* at 627-28.  She provided in-court identifications of Moore and Fife as Chatos' assailants.

{¶ 13}  On cross-examination, Erin averred that Shropshire hit Chatos prior to the bouncer slamming him to the floor.  She surmised that the bouncer did so because he believed Chatos was the "problem."  *Id.* at 650.

{¶ 14}  Merrie testified that she saw Fife while they were outside on the patio and noticed that he had several tattoos.  Fife approached her and asked why she was looking at him.  He then walked inside the bar.  To avoid any potential problems, the family decided to leave.  Because there was no exit from the patio, they had to walk through the bar area to exit through the front door.  Once inside, three men, later identified as Fife, Moore, and Shropshire, started "coming at" Chatos.  *Id.* at 690.  The bouncer and other bar patrons blocked the family's exit.  The bouncer picked up Chatos and threw him onto the floor. Fife, Moore, and Shropshire then "swarmed from behind" and "started beating [Chatos] to death."  *Id.* at 693.  In an effort to help Chatos, Merrie hit one of the men with a wine glass. In retaliation, Shropshire choked Merrie and pinned her against the wall.  Moore joined Shropshire and the two men "proceeded to beat me and stomp me in the face and my head," rendering her unconscious.  *Id.* at 696. According to Merrie, Fife "was there * * * but he did not hit me." *Id.* at 696, 729. When she regained consciousness, she was in tremendous pain;

indeed, she felt like she "was going to die." *Id.* at 697. She was transported to the hospital by ambulance and diagnosed with a "brain bleed." *Id.* at 699. As a result of her injuries, she has suffered cognitive disabilities and memory loss.

{¶ 15} On January 4, 2018, detectives interviewed her and took photographs of her injuries. (State's Ex. 1-6.) From photo arrays, she identified Fife as one of the individuals who blocked the family's exit. She knew Fife's name because Ashley had sent her photographs of him she had discovered on Facebook. At trial, Merrie specifically stated that her photo array identification of Fife was not based upon seeing his photograph on Facebook; rather, she remembered him from the bar and she also identified Fife at trial. She candidly admitted that she could not identify either Moore or Shropshire from the photo arrays. However, at trial, she positively identified Moore as the man who assaulted Chatos and then her.

{¶ 16} On cross-examination, Merrie blamed her failure to identify Moore from the photo array on her medical condition. However, she acknowledged that she did not indicate on the form accompanying the photo array that her medical condition precluded her from identifying Moore. She further acknowledged that she was presented the photo arrays closer in time to the incident, yet she could not identify Moore at that time.

{¶ 17} Michelle testified while she and her group were outside on the patio, Fife asked them why they were looking at him. As they walked inside the bar, the men, later identified as Fife, Moore, and Shropshire, surrounded them. The men grabbed Chatos by the throat and threw him into a crowd of people; they then "started wailing on [Chatos] badly." (Tr. at 739.) Chatos eventually got up and went outside with Erin. Meanwhile, Michelle saw Merrie on the floor; her face was bleeding badly and she was unconscious. She did not see how Merrie had been injured.

{¶ 18} When presented with photo arrays on January 4, 2018, Michelle identified Fife as "[t]he one that was like what are you looking at and started pushing" and Moore as the person who "was on" Merrie. (*Id.* at 749-50; State's Ex. 35a, 35b, 36a, 36b.) At trial, Michelle testified that she was "100 percent" sure of her identifications. (Tr. at 750.) She also provided in-court identifications of Fife and Moore as Chatos' assailants.

{¶ 19} Ashley testified that prior to the fight, Erin told her that Chatos was a "little upset" and might want to leave because he had seen Fife, whom he met in jail. *Id.* at at 792. While on the patio, Chatos made eye contact with Fife, who said "What's your problem? Why are you looking at me?" *Id.* at 796. Fife told Chatos that he knew him from jail and asked him if he wanted to fight. At that point, Ashley and her group decided to leave and walked into the bar. Fife followed them and then walked over to talk to his friends, later identified as Moore and Shropshire. Ashley and Merrie asked them to leave them alone. Immediately thereafter, Ashley saw the bouncer throw Chatos onto the floor. Fife, Moore, Shropshire, the bouncer, and "random other people from the bar" began punching and kicking Chatos. *Id.* at 800-01. Merrie attempted to pull the men off Chatos. To create a distraction, Ashley grabbed a bottle from the bar and threw it to the floor. Shropshire then accused Merrie of hitting him over the head with a bottle; he picked Merrie up by the neck, slammed her to the floor, and kicked her in the face several times. Moore joined Shropshire and kicked Merrie in the side of the head several times. By this time, Merrie was unconscious. Fife stood nearby, cheering on Moore and Shropshire. After the assault, the men left the bar through the front entrance. After the police arrived, Ashley recounted what had happened to Chatos and Merrie.

{¶ 20} Following the incident, Ashley searched social media sites to find the men who assaulted them. Ashley found several Facebook profiles attributed to Fife, one of which

was under the name "James Jwhiite."  *Id.* at 819-20, 826.  She subsequently found Fife's list of Facebook friends, one of whom was Moore.  She scrolled through Moore's photographs and found several he had posted of him, Fife, and Shropshire together at Rosie O'Grady's.  Ashley recognized the men in the photographs as those who had assaulted Chatos and Merrie.

{¶ 21} Ashley also found a montage of three photographs Moore posted on January 1, 2018 at 8:21 p.m.  The montage captioned "My current situation," included a close-up photograph of Moore, a photograph of Moore wearing a walking boot on his right foot, and a close-up photograph of a plate of food.  (State's Ex. 17.)  According to Ashley, Fife, through his "James Jwhiite" profile, commented on Moore's post, stating "You mean to tell me his face harder than your foot," followed by two smiley faces and one strong arm emojis.  (Tr. at 826, State's Ex. 18.)  Immediately following that comment, Moore replied, "Him and his momma."  (State's Ex. 18.)  Ashley took a screenshot of the posts and sent them to Merrie.

{¶ 22} Ashley was interviewed by detectives on January 11, 2018.  From photo arrays, she identified Shropshire as the person "who attacked [Merrie], kicking her on the ground and holding her neck against the wall."  (Tr. at 844-45, State's Ex. 38a, 38b).  She identified Moore as the person who "assisted [Shropshire] in kicking [Merrie]" and "first to jump [Chatos]."  (Tr. at 845; State's Ex. 39a, 39b.)  Finally, she identified Fife as "leader of the pack, started fight, jumped [Chatos]."  (Tr. at 846; State's Ex. 40a, 40b.)  At trial, Ashley reiterated her identifications of Moore and Fife.

{¶ 23} On cross-examination, Ashley acknowledged that by the time she was interviewed on January 11, 2018, she had already completed her Facebook investigation and had sent her family screenshots of photographs and posts from Moore's Facebook page.

She further conceded that the Facebook photographs of Moore at Rosie O'Grady's depict him wearing a dark-colored shirt, while the security footage does not depict any of Chatos' attackers wearing a dark-colored shirt.

{¶ 24} Dr. Victor Nguyen, the emergency room physician who treated Merrie at the hospital, testified that Merrie sustained multiple facial fractures as well as a subarachnoid hemorrhage, commonly known as a "brain bleed." (Tr. at 367.) Dr. Nguyen opined that Merrie's injuries would have caused serious physical pain and that her subsequent memory loss and cognitive and speech difficulties were consistent with having suffered a traumatic brain injury.

{¶ 25} Dr. Monte E. Masonbrink, the oral and maxillofacial surgeon who treated Chatos at the hospital, testified that Chatos suffered a bilateral jaw break which required surgery to wire his jaw closed. Dr. Masonbrink opined that Chatos' injuries would have been very painful, resulting in immediate speech difficulties. He further opined that Chatos' injuries were consistent with having been struck multiple times on both sides of his face or having been slammed to the ground. Dr. Masonbrink also testified that Chatos' toxicology screen revealed a blood-alcohol concentration of .142.

{¶ 26} Columbus Police Officers Adam Dague and Brandon Fleming testified as first responders at Rosie O'Grady's on January 1, 2018. Fleming described Merrie as a "concussed" woman with bloody facial injuries, who reported that two African American men, one "really heavyset," and one with a medium build, assaulted her. *Id.* at 905, 910. Medics arrived at the scene and transported Merrie to the hospital; Chatos, who had sustained injuries to his jaw, was "uncooperative" and refused to go to the hospital. *Id.* at at 909. Body cameras worn by Dague and Fleming captured both visual images and audio from the scene, which were copied onto a DVD and played during trial. (State's Ex. 45.)

{¶ 27} On cross-examination, Dague acknowledged that State's Ex. 45 depicts Erin stating that Chatos fought with only one man and that Chatos said he would "deal with it himself." (Tr. at 901.) Fleming acknowledged that State's Ex. 45 depicts Merrie describing the man with the medium build as bald and wearing a white shirt. He further acknowledged that State's Ex. 45 depicts the bouncer telling Ashley that Chatos had "start[ed] trouble." *Id.* at 920.

{¶ 28} Detective Anthony Richardson testified that he interviewed Moore at the Franklin County Jail on March 9, 2018. The audio portion of the interview was copied to a CD and played at trial. (State's Ex. 24.)[5] During that interview, Moore stated that he had turned himself into the police after becoming aware that Shropshire had already done so. He admitted that he was at Rosie O'Grady's with Shropshire and Fife and that Fife was involved in an altercation which ultimately involved bar security as well as several patrons. Moore acknowledged that he was involved in the fight inside the bar and punched several people; however, he did so only in self-defense. He stated that an unknown person hit him in the back of the head and the face with a glass bottle, which ultimately required him to have surgery to remove glass from his eye. He also stated that outside the bar, "somebody with dreads * * * was * * * trying to fight with me, but he was coming at me and I still was trying to protect myself." (Tr. at 945; State's Ex. 24.) He further averred that his face was bloody, that he had "multiple people jumping on me," and that he was "in defense mode." (Tr. at 950; State's Ex. 24.)

{¶ 29} Richardson informed Moore that security footage from the bar showed him, Fife, and Shropshire fighting with a man outside the bar and that "one of you, looked like

---

[5] Over the state's objection, the trial court did not allow the jury to listen to the interview during deliberations. However, the interview was transcribed and made part of the appellate record.

you, did the old Charlie Brown football kick right in his face when he was laying on the ground. Looked like he was trying to get up, boom, and then he was down and didn't move." (Tr. at 949; State's Ex. 24.) Moore averred that he did not remember kicking the man.

{¶ 30} Moore acknowledged during the interview that he sprained his right ankle when he fell during the fight and that he was wearing a "boot" as a result. (Tr. at 953; State's Ex. 24.) He also conceded that he posted pictures of his ankle injury on Facebook. When asked about the comment he posted about "Him and his momma," he said "I'm not going to lie to you, I was super drunk. But after the fact, everybody told me what was going on. And I'm not going to put no names on it, but I know * * * what happened with the mom * * *. I guess she was fighting too. This is what the security guard was telling me. She was fighting too." (Tr. at 955; State's Ex. 24.) Moore denied that he kicked the woman; indeed, he stated that he did not even know she was in the bar.

{¶ 31} Richardson interviewed Fife on March 29, 2018. The audio portion of the interview was copied to a CD and played at trial. (State's Ex. 44.)[6] During the interview, Fife stated that he and his wife saw Moore and Shropshire at the bar, but they were not "with them." (Tr. at 979; State's Ex. 44.) He acknowledged that there was a bar fight during which he was hit in the head with a bottle. As he and his wife were trying to leave, a man "chased me, grabbed me, threw me to the ground" in the parking lot. (Tr. at 982; State's Ex. 44.) He thought the man's wife had a gun. Richardson told Fife that security footage from the bar showed him and others beating and kicking Chatos. Fife did not recall being jailed with Chatos or fighting with him at the bar. He also did not remember Moore's foot being hurt during the fight or posting a comment about it on Facebook.

---

[6] Over the state's objection, the trial court did not allow the jury to listen to the interview during deliberations. However, the interview was transcribed and made part of the appellate record.

**{¶ 32}** On cross-examination, Richardson acknowledged that the Columbus Police Department employs social media forensic analysts; however, he did not know whether an analyst had examined Moore's Facebook account. He admitted that the Facebook comment he questioned Fife about was actually posted by a person identified as "James Jwhiite" (Tr. at 998; State's Ex. 18), and that the photographs Moore posted on Facebook on January 1, 2018 at 8:21 p.m. (State's Ex. 13), show Fife's Facebook profile as "James Fife." (Tr. at 998.)

**{¶ 33}** Richardson further acknowledged that the security footage from the bar depicts a person alleged to be Moore wearing a light-colored shirt, while State's Ex. 13 depicts Moore wearing a dark-colored shirt. In addition, he acknowledged that State's Ex. 13 demonstrates that Moore had close-cropped hair but was not bald.

**{¶ 34}** Detective Ronald Lemmon testified that Erin called him on January 3, 2018 to inquire about a police report that had been filed about the incident; the report listed Moore, Fife, and Shropshire as suspects. From this information, Lemmon generated photo arrays of the suspects, which were shown to the Obey family on January 4, 2018.

**{¶ 35}** Lemmon further testified that on January 6, 2018, he and Richardson interviewed George Buzhowski, the owner of Rosie O'Grady's, and the bouncer, Quentin Edwards. The detectives obtained security footage and submitted it to the Bureau of Criminal Investigation for enhancement. Lemmon viewed the security footage and acknowledged that the clothing colors in the security video appear to be different than those in the still photographs found on Moore's Facebook page. However, he testified that in his more than two-decade experience as a police officer, he had viewed footage from thousands of security videos and had observed the same phenomenon regarding color differences in clothing.

{¶ 36} Lemmon also testified that Merrie sent him screenshots taken from Moore's Facebook page depicting Moore, Shropshire, and Fife at Rosie O'Grady's. Lemmon then independently accessed Moore's Facebook page and printed those and other posted photographs; he also independently accessed the comments posted on Moore's Facebook page, including the post referencing his injured ankle. Lemmon testified that he was "satisfied" that the Facebook page he accessed was that of Moore. (Tr. at 1055.) Lemmon acknowledged that the Columbus Police Department employs social media forensic analysts. However, he did not engage them in the investigation because Moore had admitted in his March 9, 2018 interview that he had posted the photographs on his Facebook page and did not deny that his Facebook friends commented on them.

{¶ 37} Following the state's presentation of its case, Fife moved for judgment of acquittal pursuant to Crim.R. 29(A). The trial court denied the motion.

{¶ 38} Edwards then testified that approximately 250 people were in the bar on January 1, 2018. At some point, Moore was struck in the face with a bottle. Moore sustained a cut over his eye, and Buzhowski told Edwards to accompany Moore to the kitchen so he could tend to his injury.

{¶ 39} On cross-examination, Edwards testified that he was interviewed by a detective on January 5, 2018. In that interview, Edwards stated that the person who struck Moore with a bottle was a light-skinned African American man who was later injured in a fight. He acknowledged that he did not tell the detective that he took Moore to the kitchen during the fight. After viewing the security footage, Edwards conceded that the dark clothing he was wearing appeared to look white in the video. He denied that he threw Chatos to the floor inside the bar or later apologized to him outside. He also testified that he did not witness Chatos being beaten up in the parking lot.

{¶ 40} Moore testified that he met Shropshire and Fife at Rosie O'Grady's. At some point, Chatos approached the group and said "This ain't got shit to do with you all. I want [the] white boy."[7] Shropshire responded "[h]e's with me" and then punched Chatos. (Tr. at 1257.) Thereafter, several fights broke out, during which Chatos was thrown into the air. Moore testified he was not involved in any of the fights; he said he did not punch, kick, or hurt anyone. Moore said he was struck in the head with a bottle and in the face with a glass object which injured his eye. At some point, he fell down and twisted his ankle. Edwards then walked him, Shropshire, and Fife to the walkway between the bar and the patio. A man he did not know wearing "dreads" and a little wrap over his head "square[d] up" with him in the walkway. *Id.* at 1242. Edwards then took Moore to the kitchen and provided first aid for his eye injury; thereafter, Moore left the bar and went home. Moore testified he went to the hospital later that morning to obtain treatment for his ankle injury.

{¶ 41} Later that evening, Moore said he posted pictures of food and his injured ankle on Facebook, which generated comments from some of his Facebook friends. According to Moore, the comment he posted about "Him and his momma" was in response to comments posted by Shropshire that had been deleted. *Id.* at 1245. Although he could not remember Shropshire's precise comments, he recalled that it was "something to the effect that they got beat up," to which Moore replied "Him and his momma." *Id.* at 1246. He further averred that "I didn't know. * * * [P]eople was calling me and telling me what was going on, but I didn't know. *Id.* Moore denied assaulting either Chatos or Merrie; indeed, he denied even seeing Merrie in the bar.

---

[7] Fife is Caucasian.

{¶ 42} On cross-examination, Moore was questioned about medical records generated from his hospital visit stating that "[t]he mechanism of injury was kicking someone during an altercation last night." (Tr. at 1304; State's Ex. 51.)[8] Moore denied telling hospital personnel that he kicked someone; rather, he said only that he was in a bar fight. Noting the March 9, 2018 interview during which he told Richardson that he sustained an eye injury requiring surgery to remove glass from his eye, the prosecutor questioned Moore about medical records indicating that he had suffered no injuries to his head.

{¶ 43} Regarding the Facebook posts and comments, Moore acknowledged that "James Jwhiite" is one of his Facebook friends. (Tr. at 1313.) He did not know the context of the comment "You mean to tell me his face harder than your foot." *Id.* at 1313. He reiterated his direct examination testimony that the "Him and his momma" comment was not made in reply to that comment; rather, it was made to deleted comments made by Shropshire. *Id.* at 1314. He also testified that Shropshire hit Merrie; although he did not witness the act, Shropshire later told him about it.

{¶ 44} Kaadijah Travis, Fife's wife, testified on Fife's behalf. She and Fife met their friends Moore and Shropshire at Rosie O'Grady's. Soon after arriving, Chatos started giving Fife "dirty looks" and "rolling his eyes" at him. (Tr. at 1332.) Fife told Kaadijah he had never seen Chatos before. They later saw Chatos on the patio; he again gave them "dirty looks." *Id.* at 1333. When Kaadijah confronted Chatos about his behavior, he "got mad" and walked toward Fife like he wanted to fight him. *Id.* at 1333. Sensing that things might "go bad," she pulled Fife toward the bar so he would be closer to his friends. *Id.* at 1334.

---

[8] State's Ex. 51 was identified at trial but was not admitted into evidence.

{¶ 45} Soon thereafter, a fight broke out inside the bar. Kaadijah was injured during the fight and went to the bathroom to clean up. She remained there for several minutes; consequently, she did not see what happened inside the bar. After she returned to the bar, she and Fife walked toward their car. They encountered Chatos and Erin in the parking lot; Erin pointed a gun at them. At Fife's direction, Kaadijah got into their car. She then saw Fife fall to the ground; although she did not see who did so, she deduced that someone hit him.

{¶ 46} The case was submitted to the jury and, following deliberations, the jury returned verdicts finding Fife guilty as charged in the indictment.[9] The trial court subsequently sentenced Fife to four years' incarceration for the felonious assault of Chatos and four years' incarceration for the felonious assault of Merrie. The court ordered the sentences to be served consecutively, resulting in an aggregate prison term of eight years. The trial court memorialized the conviction and sentence in a judgment entry filed June 24, 2019.

{¶ 47} In a timely appeal, Fife sets forth four assignments of error for review:

1. THE TRIAL COURT ABUSED ITS DICREATION [sic] WHEN IT DENIED THE APPELLANT'S MOTION FOR A MISTRIAL.

2. THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DENIED THE REQUESTED LESSER INCLUDED OFFENSES PROPOSED BY APPELLANT IN THE JURY INSTRUCTIONS.

3. APPELLANT DID NOT RECEIVE EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF HIS RIGHTS UNDER THE OHIO CONSTITUTION AND THE 14TH AND 6TH AMENDMENTS TO THE UNITED STATES CONSTITUTION[.]

---

[9] The jury also returned verdicts finding Moore guilty as charged in the indictment.

4. THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST APPELLANT WHEN THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN THE CONVICTIONS AND THE CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 48} In his first assignment of error, Fife contends that the trial court erred in refusing to grant his motion for a mistrial when the trial court excused "Juror H" when she informed the trial court she had a scheduling conflict at the end of the day and the jury had not reached a verdict. Fife's co-defendant Jordan Moore raised a similar assignment in his appeal and this court overruled that assignment of error in *State v. Moore*, 2021-Ohio-1379, rendered on April 20, 2021.

{¶ 49} The facts concerning the excusal of Juror H are set forth in paragraphs 87 through 103 of the *Moore* decision. They are as follows:

At 11:52 a.m., the jury began its deliberations. At 1:42 p.m., the jury requested an electronic device in order to review the video evidence; with agreement of counsel, the court provided the requested device. At 3:39 p.m., the trial court addressed one of the regular jurors in open court: "[Juror H], it's my understanding you have work commitments and can no longer serve." Juror H responded, "Correct." *Id.* at 1562. The court asked the prosecutor and both defense counsel if there was any objection to releasing Juror H and substituting one of the alternate jurors [Juror J]. No objection was lodged. The court then excused Juror H and swore in Juror J as a regular juror. Thereafter, the court advised the jury, "You guys get to start anew. All over from the scratch. [Juror J] hasn't had the benefit of your wisdom. Okay? So with that, you're excused to go back." *Id.* at 1563. At 3:40 p.m., the jury resumed deliberations.

At 3:45 p.m., the court met with the excused juror, Juror H, outside the presence of the defendants, counsel, and jury. Juror H averred that during the jury's discussions concerning the timetable for deliberations, she reported that she had to leave by 4:30 p.m. She further averred that at this point, the jury was "not in agreement" and that she was the one "holding up the agreement." *Id.* at 1565-66. Juror H further asserted

that the jury concluded that it would have to reach a verdict by 3:30 p.m. in order to accommodate Juror H's 4:30 p.m. departure time. According to Juror H, the jury foreperson indicated that she wanted to "push through" with the deliberations because she had to catch a flight at 7:30 p.m.; accordingly, the foreperson suggested replacing Juror H with an alternate juror. When the court asked Juror H if she was "bullied," she responded "possibly." *Id.* at 1566. She reiterated that she was the only juror voting for acquittal. The court averred that she should have addressed her concerns to the court during the previous discussion about excusing her.

At 3:51 p.m., the trial court informed counsel of the conversation with Juror H. Both defense counsel moved for a mistrial, arguing that given Juror H's allegations about coercion, the alternate juror might be similarly coerced into voting to convict. The prosecutor opposed the motion, arguing that Juror H asked to be excused, the parties accepted her proffered excuse, and an alternate juror had been substituted.

The trial court then placed Juror H under oath and permitted her to explain what had occurred. To that end, Juror H averred that prior to deliberations, she informed the jury she had to leave by 4:30 p.m. During deliberations, she was the only juror who was voting for acquittal. At 3:10 p.m., the foreperson informed the bailiff that because the jury likely would be deliberating past Juror H's stated departure time and the jury wanted to reach a verdict that day, an alternate juror might be needed. *Id.* at 1575. The jury agreed with this course of action.

Upon questioning by the prosecutor, Juror H indicated that had the jury been unable to reach a verdict by 4:30 p.m., she would have suggested resuming deliberations the next day. However, other jurors indicated that they had conflicts the next day and would like to resolve the matter that day. Juror H averred that she did not ask to be excused from the jury. When asked why she did not disclose this information when the court originally questioned her, she stated "I feel like I'm outnumbered up here." *Id.* at 1579. She also stated that she would not have felt comfortable rejoining the jury because "I'm the only one who's holding up their progress." *Id.* Appellant's counsel asked Juror H if she believed the foreperson's request that she no longer serve on the jury "was a way of freezing you out of the deliberations." *Id.* at 1580. Juror H replied, "I think it's possible." *Id.* The trial court stated that it would investigate the matter and excused Juror H from the courtroom.

Shortly thereafter, the trial court informed counsel that the jury had in the last five minutes indicated that it had reached a verdict. The prosecutor suggested that the court voir dire the remaining 11 jurors prior to ruling on the motion for mistrial. Counsel for appellant renewed the motion for mistrial, arguing that "it seems suspect that the new juror who came up was there for less than 50 minutes, and there's no way that they could have reviewed the things that they even asked for earlier with her in that time frame." *Id.* at 1583. Counsel further contended that he was never informed that Juror H had suggested that the jury cease deliberations only for the evening and reconvene the next day. Counsel also argued against voir dire of the remaining jurors.

The trial court determined that it would voir dire the remaining 11 jurors individually. Prior to questioning each juror, the court explained that Juror H had reported that she felt she was coerced and had been forced off the jury because she was the sole vote for acquittal.

The first juror questioned, Juror E, stated that "[t]here was no coercion or anything like that. We deliberated, and it looked like it was going to go on and on." *Id.* at 1588. Because other jurors had indicated that they could not come back the next day, the jury concluded that it would be better to "push this through and stay late." *Id.* Juror E acknowledged that Juror H was the sole juror voting for acquittal and that the other 11 jurors were convinced of guilt beyond a reasonable doubt; however, those 11 jurors did not try to force Juror H to adopt a different position. He denied that Juror H was told she was being replaced by an alternate juror; rather, the jury "hashed it out." *Id.* at 1589. Juror E indicated that the reconstituted jury had reached a unanimous verdict.

Juror S averred that after Juror H indicated that she had to leave by 4:30 p.m., the foreperson asked the bailiff how much time would be involved in the post-verdict process, i.e., assembling in the courtroom, reading the verdict, de-briefing the jury, etc. The bailiff's response prompted the realization that Juror H's 4:30 p.m. departure time left only 10 to 15 minutes to deliberate that day. The jury, including Juror H, concluded that it could not reach a verdict within that timeframe. Because other jurors had conflicts the next day, it was decided an alternate juror was required. Juror S further indicated that although Juror H did not expressly state as much, it was assumed that she could return the next day and continue deliberations.

Juror B, the foreperson, denied that Juror H was coerced and forced off the jury. Juror B averred that the jury contemplated an "alternate juror situation" as soon as Juror H announced her 4:30 p.m. departure deadline because there were other jurors who had conflicts with resuming deliberations the next day. Juror B stated that the jury had begun deliberations and had taken a preliminary vote; however, that vote was "by no means * * * anything final." *Id.* at 1599. At approximately 3:00 p.m., the jury discussed the timeline of the deliberations and post-verdict process and determined that to accommodate Juror H's 4:30 p.m. departure time, it would need to reach a verdict in the next 10 to 20 minutes. The jury, including Juror H, "took a vote and said that we would like to actually push on so that we could get either further deliberations done today with the alternate juror, that we knew we were going to have to bring in regardless, and the rest of us wanted to * * * stay and continue to kind of talk through it. We didn't have the same * * * stopping time as what her constraints were for the day." *Id.* at 1600. The trial court confirmed with Juror B that "this was an open vote in the room * * * and Juror H agreed." Juror B replied, "Absolutely, yeah. This was not anything of coercion." *Id.*

When questioned by counsel for appellant as to what Juror H "agree[d] to," Juror B averred that "[s]he agreed that she had her conflict and * * * so we talked about what the different scenarios would be in bringing in an alternate this evening and restarting the deliberation process. * * * She kind of stated again that she had that conflict. She wasn't going to be able to move that or make any changes to that, and that the rest of us * * * said we wanted to push on." *Id.* at 1600-01. Juror B acknowledged that Juror H stated only that she could not continue deliberations that day; she did not aver that she could not deliberate the next day.

Following Juror B's testimony, the trial court stated, "I have a real problem if they voted amongst themselves to do it and then [Juror H] cries sour grapes afterwards. * * * [Juror B] indicated in her testimony that they voted inside that this is what they were going to do as a group. * * * [I]f [Juror H] wanted to go and they were going to bring in an alternate and everybody voted on that back there." (Tr. at 1604-05.) The court then continued its voir dire of the individual jurors.

Juror N testified that the jury as a whole voted to replace Juror H with an alternate. When the trial court asked if Juror H

"voted positively" and was "okay with the decision," Juror N replied "[y]es." *Id.* at 1606. Juror N denied that the jury discussed time constraints involving the verdict and post-verdict process.

Following Juror N's testimony, the trial court asserted, "Quite frankly, I've think I've heard enough. I think I want to take the verdict, [take the] motion * * * under advisement, and argue it * * * in the morning." *Id.* at 1608. The court then asked defense counsel if more voir dire was necessary; both counsel answered in the negative. However, counsel for [Moore] averred, "I just don't believe that we're going to get around this group-think mentality. * * * I highly doubt that any juror is going to come in here and potentially say, Yeah, we forced her to get off of here. * * * [A]nd * * * if [the bailiff] would have come to me and said they want to bring up an alternate because [Juror H] wants to leave and go to work at 4:30 but she wants to keep deliberating, there's no way I would have agreed to bringing up an alternate." *Id.* at 1609.

Thereafter, the court averred, "I am satisfied with the following facts that I hear: I hear that it was a mutual vote inside from two of the jurors. It wasn't mentioned by the other two. But I thought that the third one was probably the most trustworthy of all. * * * [Juror B] indicated there was a vote taken [and] everybody was in agreement that [Juror H] was going to step off. Where [Juror H] gave the opposite indication where she was forced out. * * * And I have a real problem with that. * * * I still have the dilemma of an allegation of being forced out. * * * And that's why I wanted to hold * * * the motion for mistrial in abeyance until tomorrow * * * when we * * * all have some time to do a little research and have an argument and make a decision. I may still well mistry this case." *Id.* at 1611-12.

Thereafter, at 5:06 p.m., the jury announced its verdicts. The jury found both appellant and Fife guilty of felonious assault as charged in the indictments. At defense counsel's request, the jury was polled; all 12 jurors confirmed the verdicts.

The next day, the prosecutor filed a written memorandum opposing the motion for mistrial. The trial court held a hearing on the matter during which the parties argued their respective positions. The court took the matter under advisement and issued a written decision the next day. Therein, the court set forth a detailed recitation of the proceedings related to the removal of Juror H. The court concluded that the

> circumstances surrounding the replacement of Juror H with an alternate juror did not warrant a mistrial. The court stated:
>
> The facts presented to the Judge at the time of the removal convinced this Judge that [Juror H] would no longer be able to perform her duty as a juror. [Juror H] consistently indicated that she had a scheduling conflict which prevented her from continuing deliberations beyond 4:00 p.m. on May 6, 2019. At approximately 3:00 p.m., the remainder of the jury wished to proceed with deliberations beyond 4:00 p.m.
>
> Thus, an alternate juror was put in place with instructions to start deliberations anew, and there is no evidence before the Court that they did not do so. With that directive, the Court finds that Defendants received the fair trial to which they were entitled.
>
> The fact that [Juror H] came forward after her removal with allegations of misconduct does not change this result.
>
> (May 8, 2019 Entry denying Def's. Mot. for Mistrial at 3.)

*Moore* at ¶ 87-103.

{¶ 50} Upon a review of the trial record, this court in *Moore*, with this judge participating, found no abuse of discretion in the trial court's decision to replace Juror H with Juror J or in the denial of Moore's and Fife's motion for a mistrial. *See Moore* at ¶ 106. Fife's first assignment of error is overruled for the same reasons given in that opinion.

{¶ 51} In his second assignment of error, Fife contends that the trial court erred when it refused to grant his request that the jury be instructed on the lesser included offenses of aggravated assault and simple assault in regard to the felonious assault charges.

{¶ 52} The offense of aggravated assault states that "No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly * * * cause serious physical harm to another. R.C. 2903.12.

{¶ 53} "[A] defendant charged with felonious assault is entitled to an instruction on aggravated assault when the evidence presented at trial reasonably would support both an acquittal on the charged crime of felonious assault and a conviction for aggravated assault." *State v. Glass*, 10th Dist. No. 04AP-140, 2004-Ohio-5843, ¶ 3. "[A] jury instruction must be given on a lesser included or offense of inferior-degree 'when sufficient evidence is presented which would allow a jury to *reasonably* reject the greater offense and find the defendant guilty on a lesser included [or inferior-degree] offense[.]' " *Id.*, quoting *State v. Shane*, 63 Ohio St.3d 630, 632 (1992). As provided in *Glass*:

> To ascertain whether the requisite provocation exists, "an objective standard must be applied to determine whether the alleged provocation is reasonably sufficient to bring on a sudden passion or fit of rage. That is, the provocation must be 'sufficient to arouse the passions of an ordinary person beyond the power of his or her control.' If this objective standard is met, the inquiry shifts to a subjective standard, to determine whether the defendant in the particular case 'actually was under the influence of sudden passion or in a sudden fit of rage.' " [*State v. Mack*, 82 Ohio St.3d 198, 201 (1998)], quoting *Shane*, at 634-635.

*Id.* at ¶ 5.

{¶ 54} Concerning Count 1, the felonious assault charge related to Chatos, Fife notes that he was in the parking lot when he saw Chatos come toward him to fight and that he saw Obey's wife had obtained a firearm from her car. He also argues there was testimony that he struck Mr. Obey during this outside confrontation. Fife notes that his own wife testified she and Fife saw Ms. Obey with the gun before he was taken to the ground.

{¶ 55} As to Count 2, relating to the felonious assault of Merrie, Fife noted there was testimony that he and his group had been hit by flying glass bottles while inside the bar and Ashley admitted she had thrown the bottles. He admitted there was testimony that he

cheered Shropshire on while he struck Merrie in response to being hit with champagne bottles.

{¶ 56} Fife also argues there was evidence of the mitigating element of serious provocation presented by him and his witnesses. Fife argues, "[h]aving a gun pulled on you and your wife, and being smashed over the head with champagne bottles * * * more than qualifies as adequate provocation [for him to have responded] with hands and feet." (Appellant's Brief at 49.) Acknowledging there were inconsistencies in the version of events presented by many different witnesses, he argues "these inconsistencies should have been left for a jury to resolve." *Id.* at 49.

{¶ 57} Fife submits that the trial court also erred in denying his request for an instruction on the lesser included offense of simple assault. Simple assault requires that "[n]o person shall recklessly cause serious physical harm to another." R.C. 2903.13(B). In the context of the infliction of serious physical harm, felonious assault differs from simple assault in its lower mens rea element: simple assault requires a mens rea of "recklessly" and felonious assault required a mens rea of "knowingly." *Compare* R.C. 2903.13(B) with 2903.11(A) ("No person shall knowingly * * * [c]ause serious physical harm to another[.]")

{¶ 58} Fife argues that there was evidence presented which would support a finding by the jury that he did not knowingly cause serious physical harm but did so recklessly. He argues that a reasonable jury could have found that he did not intend to knowingly inflict the level of harm which occurred, but that his actions were only reckless in that regard. Fife argues that there was significant evidence presented that showed most of the parties involved in the melee that evening were intoxicated and all used questionable judgment and control of their behavior. According to Fife, there was also significant evidence that

showed that he was being antagonized by Chatos, and that any alleged harm inflicted upon Chatos was not intended to be serious.

{¶ 59} The state argues that there was no evidence that supported an instruction on aggravated assault. The state argues that the facts conclusively show that Fife was the aggressor and there was zero evidence of provocation by either victim. The state argues that Fife's statement to police weighed against his request for these jury instructions as he never indicated that he was in a sudden rage or passion or provoked into participating in the fight. In his statement, Fife denied knowing Chatos, and he denied being involved in the fight until he was showed surveillance video. It was only after seeing those images that Fife admitted he had been involved.

{¶ 60} The state argues that there was no evidence presented that either Chatos or Merrie did anything to provoke the attack by Fife and his companions. Also, the state notes that Fife never described any provocation by the victims when discussing the incident with the police. Rather, Fife sought to minimize the altercation as a mere "bar fight." (Appellee's Brief at 25.) The state argues that the conduct of three men attacking the two defenseless victims was far more than a bar fight because they ambushed and severely beat Chatos inside the bar and then turned on Chatos' mother and kicked her until she lost consciousness.

{¶ 61} The state notes that Fife and his associates then regrouped outside the bar and again assaulted Chatos. While Chatos was unconscious on the ground, co-defendant Moore kicked Chatos' head so hard he injured his own ankle.

{¶ 62} The state admits Merrie threw an empty wine glass at the man who was on top of her son. (Tr. at 695.) Also, Ashley testified she threw a bottle on the floor to distract the men who were violently assaulting Chatos. *Id.* at 801. The state argues that the actions

of Merrie came after Fife and his friends initiated the fight and started beating Chatos. The state argues that Merrie's actions in defense of her son cannot be reasonably considered provocation.

{¶ 63} A criminal defendant is entitled to an inferior offense instruction when the evidence presented at trial would reasonably support both an acquittal on the charged offense and a conviction for the inferior degree offense. *State v. Shane*, 63 Ohio St.3d 630, 632 (1992). Fife contends he was severely provoked into engaging in the bar fight which led to the serious injuries of the victim.

{¶ 64} A defendant is not entitled to an instruction on the lesser-included offense of aggravated assault if he instigated the confrontation or was the initial aggressor during the encounters with the victim. *State v. Moore*, 4th Dist. No. 15CA3717, 2016-Ohio-8274, ¶ 23.

{¶ 65} Determining whether sufficient evidence of serious provocation exists involves an objective and subjective inquiry. *State v. Mack*, 82 Ohio St.3d 198, 201 (1998). Under the objective part of the inquiry, provocation is reasonably sufficient to bring on a sudden passion or fit of rage if it would "arouse the passions of an ordinary person beyond the power of his or her control." *Shane*, 63 Ohio St.3d at 635. "If insufficient evidence of provocation is presented, so that no reasonable jury would decide that an actor was reasonably provoked by the victim, the trial judge must, as a matter of law, refuse to give" an aggravated assault instruction. *Id.* at 634.

{¶ 66} A trial court has discretion to determine whether the record contains sufficient evidence to support an aggravated assault instruction. *State v. Mitts*, 81 Ohio St. 3d 223, 228 (1998). Although there was some evidence that some words were exchanged outside the bar in the patio, no reasonable jury member could conclude Chatos' words were sufficient provocation for the beating he took from Fife and his companions which followed.

The trial court did not abuse its discretion in refusing to give the instruction on aggravated assault.

{¶ 67} The trial court also did not abuse its discretion in refusing to give the defendant's requested instruction on simple assault. Viewing the defendant's evidence in its best light, Fife had to know that his conduct and that of his companions was likely to cause serious physical harm to Chatos and Merrie. R.C. 2901.22(B) provides that a person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. No reasonable juror could not have found that Fife acted knowingly rather than recklessly. Fife's second assignment of error is overruled.

{¶ 68} In his third assignment of error, Fife contends he was denied the effective assistance of counsel when his trial counsel failed to ask "Juror H" questions when she requested that she be excused due to a work complaint. Fife notes there was "zero questioning" about the juror's ability to return the following day or whether she was the only one who had time commitments that day, by either counsel or judge. (Appellant's Brief at 54.) He notes that it came to light in the following 30 minutes that many others had time constraints and issues, who did not ask to be replaced, only Juror H—the lone holdout for a not guilty verdict.

{¶ 69} Fife submits that after a lengthy trial, not questioning a juror who is seeking removal falls below the level of adequate representation and deprived him of effective assistance of counsel. Appellant also submits that it obviously prejudices his case based on the information later received, and that the result would have been different had he not acted in a deficient manner and expose the misconduct of the jury which was unknown at the time the juror was excused.

{¶ 70} We addressed a similar claim in *Moore*. Judge Klatt addressed this issue as follows:

> Appellant also argues that his trial counsel was deficient for failing to question Juror H before he agreed to her removal as a juror. In support of his argument, appellant cites counsel's assertion at the hearing on the motion for mistrial that he would have questioned Juror H had he been properly apprised of the circumstances precipitating the removal. To be sure, defense counsel advanced this argument, albeit in hindsight, in conjunction with the motion for mistrial. However, at the time of the removal, Juror H represented to the parties and the court only that she had a scheduling conflict which precluded her continued jury service; she provided no other information. Given the reason asserted by Juror H, no further inquiry was necessary. Under these circumstances, counsel was not deficient in failing to further question Juror H.
>
> Moreover, even if appellant could establish deficient performance, he still must demonstrate that but for counsel's unprofessional error, there is a reasonable probability that the outcome of the trial would have been different. Such a finding would require this court to assume that further inquiry by counsel would have altered the trial court's decision to remove Juror H and that Juror H's presence on the jury would have resulted in, at the very least, a hung jury. We decline to engage in such rank speculation.

*Id.* at 116-17.

{¶ 71} For the foregoing reasons, this court then concluded that Moore had failed to demonstrate that he was denied his constitutional right to the effective assistance of counsel and overruled the associated assignment of error. Fife's third assignment of error is overruled.

{¶ 72} In his fourth assignment of error, Fife argues his conviction is not supported by sufficient evidence and is against the manifest weight of the evidence.

{¶ 73} In *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, the Supreme Court of Ohio reiterated that *State v. Thompkins*, 78 Ohio St.3d 380 (1997) is still good law.

That court stated that sufficiency and manifest weight are concepts that are different. Sufficiency is a legal standard which determines whether a case may go to the jury or legally sufficient to support a jury verdict as a matter of law. It is a question of law. In a manifest weight review, the appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses, and determines whether the jury in resolving the conflicts in the evidence lost its way and created a manifest miscarriage of justice. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. *Id.* at 387.

{¶ 74} Our review of the evidence convinces us the judgment of the trial court is neither based on insufficient evidence nor is against the manifest weight of the evidence. Fife's fourth assignment of error is overruled.

{¶ 75} Having overruled appellant's first, second, third, and fourth assignments of error, we hereby affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

DORRIAN, P.J. and MENTEL, J., concur.

BROGAN, J., retired, of the Second Appellate District, assigned
to active duty under authority of Ohio Constitution, Article IV,
Section 6(C).

_____